[L.A. No. 31162. Jan. 28, 1982.]

BOBBY JOE MAXWELL, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Laidley & Lawson, Pierpont M. Laidley, Fred Alschuler and Walter Alschuler for Petitioner.

John H. Larson, County Counsel, and John P. Farrell, Deputy County Counsel, for Respondent.

No appearance for Real Party in Interest.

OPINION

NEWMAN, J.—One due process requirement is that an individual charged with serious crime be represented by competent and independent counsel. Another is that courts generally must not interfere with defendant's informed conclusions as to how his defense ought to be conducted. In this lawsuit, which involves an indigent defendant accused of capital murder, those two requirements appear to conflict; and we must decide which one commands more deference.

 The precise issue is whether the trial court erred when, notwithstanding petitioner's protest, it recused his retained counsel and appointed substitute counsel—on the ground that the fee contract, giving retained counsel the right to exploit petitioner's life story, created an intolerable conflict of interest. We conclude that petitioner knowingly and intelligently waived the potential prejudice and, therefore, that the trial court did err.

Petitioner is charged with four counts of robbery (Pen. Code, § 211) and ten of murder (§ 187), some of which involve special circumstances raising the possibility that he will be sentenced to death (§ 190.2). He retained attorneys who seem to be experienced criminal defense lawyers.

The contract provides that irrevocably he assigns to counsel, as their fee, "any and all right, title, and interest, of any kind, nature and description throughout the world in and to the story of [his] entire life ..." including all entertainment and commercial exploitation rights. He is to receive 15 percent of the "net amount" realized by the exploitation. He promises to cooperate in the exploitation efforts and not to disclose his story to others except with counsel's consent or as required by law or his defense.

In the contract he waives all defamation and invasion-of-privacy claims against counsel that may arise from the exploitation. Counsel are not obligated to undertake an appeal, and appellate representation and fees therefor are declared to be subjects of later negotiation.[1]

---

[1]The contract includes provisions designed to ensure counsel's right to receive and exploit confidential material about petitioner's life. In paragraph 37 he agrees to waive, on counsel's demand, his attorney-client privilege and "any and all other privileges and rights which would prevent the full and complete exercise" of counsel's interests. In paragraph 33 he promises to (1) give counsel all materials he has "pertaining to [his] life and experiences," (2) use his best efforts to obtain and turn over such materials in the hands of others, and (3) "confer with [counsel] ... as often as [they] shall reasonably require so as to enable [them] to elicit from [him] all details" of his life.

A client may surrender his privilege of confidentiality (see Evid. Code, §§ 912, subd. (a), 954), and a fact he gives his lawyer permission to reveal is not a "secret" the lawyer must preserve (see Bus. & Prof. Code, § 6068). However, counsel conceded at oral argument that paragraph 37 overreaches and disclaimed intent to rely on it. Moreover, whether or not paragraph 33 was similarly waived, we think it cannot be invoked until after these criminal proceedings have become final. Though counsel contracted to represent petitioner only through trial, the State Bar's Rules of Professional Conduct and the agreement itself impose duties of fairness, undivided loyalty, and diligent defense. (See rules 2-111(A)(2) [lawyer withdrawing from employment must act reasonably to avoid prejudice to client], 5-101 [lawyer may not acquire interest adverse to client ex-

The contract reflects extensive disclosure of possible conflicts and prejudice. It declares that counsel may wish to (1) create damaging publicity to enhance exploitation value, (2) avoid mental defenses because, if successful, they might suggest petitioner's incapacity to make the contract, and (3) see him convicted and even sentenced to death for publicity value. But a catch-all paragraph—after reciting that other, unforseen conflicts may also arise—reads: *"The Lawyers will raise every defense which they, in their best judgment based upon their experience feel is warranted by the evidence and information at their disposal and which, taking into consideration the flow of trial and trial tactics, is in Maxwell's best interests. The Lawyers will conduct all aspects of the defense of Maxwell as would a reasonably competent attorney acting as a diligent conscientious advocate."* (Italics added.)

In another paragraph petitioner is told of his right to appointed counsel (because he is indigent), and he is urged to seek independent legal advice about the matter. It is recited that retained counsel have supplied him with (1) a list of lawyers known by them, (2) the address and telephone number of the county bar referral service, and (3) a photocopy of "Attorneys" listings in the yellow pages for the Los Angeles area.

On April 9, 1979, petitioner was arraigned in municipal court. He pleaded not guilty and reserved the right to plead not guilty by reason of insanity. On April 26 counsel notified the court of his indigency and of the retainer contract. Judge Gutierrez questioned him and received his proffered waiver of all conflicts. After preliminary hearing (closed at counsel's request) petitioner was bound over for trial. He reiterated his municipal court pleas, and a defense psychiatrist and an investigator were appointed.

At the September 14 hearing Judge Malone on his own motion inquired into the contract and examined petitioner. Via questions and answers he established that petitioner was literate, had an eighth-grade education, had read and signed the entire contract, had separately initialed many critical paragraphs, knew he could consult an independent attorney, and on his own chose not to do so. The judge called his attention specifically to the paragraphs disclosing potential conflicts and

---

cept as fair and reasonable]; cf. Agreement, pars. 14(d), 17.) Those duties would be violated if counsel disclosed prejudicial, confidential material at any time during the criminal proceedings.

confirmed that petitioner had read carefully and understood each entry. He replied affirmatively when asked if he remained satisfied with counsel's conduct.

After considering the psychiatric reports submitted in confidence by counsel, the judge ruled that (1) petitioner knowingly and willingly had chosen not to seek outside advice and was satisfied with his representation and the contract, and (2) counsel's competency was not at issue, but (3) counsel nonetheless must be disqualified because of the inherent conflict created. Four days later, *after confirming that petitioner still wished to proceed with his retained lawyers*, Judge Malone recused them and appointed substitute counsel. Petitioner seeks mandate to overturn the rulings.

### WHEN MAY DEFENDANT DEMAND "DEFICIENT" COUNSEL?

Respondent (the Los Angeles Superior Court, represented by county counsel[2]) contends that the fee contract effected a conflict contrary to constitutional guarantees of effective counsel, violated ethical standards, and jeopardized the integrity of the judicial process.

■ The right to counsel guaranteed by section 15 of article I of the California Constitution does contemplate effective counsel, and effectiveness means more than mere competence. Lawyering may be deficient when conflict of interest deprives the client of undivided loyalty and effort. (See *People* v. *Corona* (1978) 80 Cal.App.3d 684, 720 [145 Cal.Rptr. 894]; cf. *Glasser* v. *United States* (1942) 315 U.S. 60, 75-76 [86 L.Ed. 680, 701-702, 62 S.Ct. 457].)

Protection of a defendant's right to loyal counsel is essential. This court has said that trial judges assume the burden of ensuring that their appointments of counsel for indigent defendants do not "result in a denial of effective-counsel because of some possible conflict...." (*People* v. *Cook* (1975) 13 Cal.3d 663, 671 [119 Cal.Rptr. 500, 532 P.2d 148]; but cf. *Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 346-347 [64 L.Ed.2d 333, 345-346, 100 S.Ct. 1708].) ■ When a conviction is attacked validly on the ground that an appointed lawyer was influenced by conflict of interest the appellate court may not "'indulge in nice calculations as to the amount of [resulting] prejudice...,'" and the con-

---

[2]The People, real party in interest, have taken a position on the recusal order in neither trial nor appellate courts.

viction must be reversed if the record supports "informed speculation" that the conflict was prejudicial. (*People* v. *Chacon* (1968) 69 Cal.2d 765, 776-777, and fn. 3 [73 Cal.Rptr. 10, 447 P.2d 106]; see too *Glasser, supra*, 315 U.S. 60, 76 [86 L.Ed. 680, 702].[3])

Yet effective assistance is linked closely to representation by counsel of choice. When clients and lawyers lack rapport and mutual confidence the quality of representation may be so undermined as to render it an empty formality. Hence many precedents recognize that the constitutional right to counsel includes a reasonable opportunity for those defendants who have the necessary resources to control the designation of their legal representatives. (E.g., *Crooker* v. *California* (1958) 357 U.S. 433, 439 [2 L.Ed.2d 1448, 1453-1454, 78 S.Ct. 1287], overruled on other grounds, *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], rehg. den., 385 U.S. 890 [17 L.Ed.2d 121, 87 S.Ct. 11]; *Chandler* v. *Fretag* (1954) 348 U.S. 3, 9 [99 L.Ed. 4, 9-10, 75 S.Ct. 1]; *Willis* v. *United States* (9th Cir. 1979) 614 F.2d 1200, 1202; *United States* v. *Bragan* (4th Cir. 1974) 499 F.2d 1376, 1379.)

California decisions are in accord. While acknowledging that the right to chosen counsel is not absolute they limit severely the judge's discretion to intrude on defendant's choice of counsel in order to eliminate potential conflicts, ensure adequate representation, or serve judicial convenience.

*People* v. *Crovedi* (1966) 65 Cal.2d 199 [53 Cal.Rptr. 284, 417 P.2d 868] held that a court abused its discretion by denying a continuance during retained counsel's temporary incapacity. "[T]hough it is clear," said *Crovedi*, "that a defendant has no *absolute* right to be represented by a particular attorney [fn. omitted], still the courts should make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney . . . . [¶] . . . [T]he state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, *using any legitimate means within his re-*

---

[3]The Supreme Court has ruled that the federal Constitution requires automatic reversal when defendant shows (1) that the trial court improperly refused a change of counsel sought by defendant after timely disclosure of potential conflict, or (2) that an actual, unwaived conflict "adversely affected" counsel's performance. (*Cuyler, supra*, 446 U.S. 335, 348 [64 L.Ed.2d 333, 346]; *Holloway* v. *Arkansas* (1978) 435 U.S. 475, 488-489 [55 L.Ed.2d 426, 436-438, 98 S.Ct. 1173].)

*sources*—and ... that desire can constitutionally be forced to yield only when it will result in *significant prejudice* to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (Pp. 207-208, first italics original.)

Despite that concern with "significant prejudice" this court has stressed that the judge's finding of potential incompetence or conflict usually does not justify court-ordered removal. *Smith* v. *Superior Court* (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65] concluded that a trial court could not, over defendant's objection, recuse his lawyer even where the judge from preliminary observation had become convinced of the lawyer's incompetence. Speaking for a unanimous court Justice Mosk said that to protect the right to counsel "the judge must be on his guard neither to infringe upon the defendant's right to counsel of his choice, nor to compromise the independence of the bar. . . ." (P. 559.)

A few months later Justice Mosk spoke again for the unanimous court: "We recently held [in *Smith*] that a court has no power to remove a defense attorney, over the objections of both the defendant and that attorney, upon a finding that the latter is 'incompetent' because of purported ignorance of the law to try the particular case. . . . *A fortiori*, a court cannot remove an attorney on the far less relevant ground of the nature of the financial arrangement between him and his client. To do so would, as in *Smith*, infringe upon the defendant's right to counsel of his choice and compromise the independence of the bar. When a defendant appears with retained counsel, it is clear the court has no power to inquire into the defendant's personal financial condition, to determine that he is unable to pay his chosen attorney an 'adequate' fee, and to order that he be represented instead by court-appointed counsel or the public defender [fn. omitted]; when a defendant appears with a public defender who is satisfied from his own inquiry that his client is eligible for his services, such judicial interference with their relationship would be no less tolerable. As we explained in *Smith*, 'the relationship is independent of the source of compensation, for an attorney's responsibility is to the person he has undertaken to represent rather than to the individual or agency which pays for the service. . . . It follows that once counsel is appointed [or undertakes] to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the parties enter into an attorney-client relationship which is no less inviolable than if counsel had been retained. To hold otherwise would be to subject that relationship to an unwarranted and invidious discrimination

arising merely from the poverty of the accused.'" (*Ingram* v. *Justice Court* (1968) 69 Cal.2d 832, 840 [73 Cal.Rptr. 410, 447 P.2d 650, 36 A.L.R.3d 1391].)

■ Still later this court observed without dissent that "the involuntary removal of any attorney is a severe limitation on a defendant's right to counsel and may be justified, if at all, only in the most flagrant circumstances of attorney misconduct or incompetence when all other judicial controls have failed...." (*Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 697 [122 Cal.Rptr. 778, 537 P.2d 898].)

*People* v. *Cook, supra,* 13 Cal.3d 663 rejected defendants' contention of prejudice relating to retained counsel's joint representation of several codefendants. This court explained that the judge's obligation to avoid appointments of conflicted counsel does not apply where counsel has been retained. "Indeed," said the court, "it is extremely doubtful that defendants' right to retain counsel of their own choice could or should be challenged by the trial court." (Pp. 671-672.)

Protection of defendant's right to reject unwanted counsel has progressed also on other fronts. We now know that a mentally competent defendant who duly waives counsel, may dismiss his lawyer and represent himself no matter how much the judge doubts his legal ability. (*Faretta* v. *California* (1975) 422 U.S. 806, 819-821 [45 L.Ed.2d 562, 572-574, 95 S.Ct. 2525].) And if he timely requests substitution of appointed counsel the court at a minimum must inquire into the reasons for his displeasure with his attorney. (*People* v. *Marsden* (1970) 2 Cal.3d 118, 122-124 [84 Cal.Rptr. 156, 465 P.2d 44].)

Developments such as those point to the conclusion that chosen representation is the preferred representation. Defendant's confidence in his lawyer is vital to his defense. His right to decide for himself who best can conduct the case must be respected wherever feasible.[4]

---

[4]*Ingram* recognized that the right to chosen counsel extends, insofar as feasible, to the poor. (69 Cal.2d at pp. 840-841.) But for them, of course, the right too often is illusory. Realistically an indigent defendant may have trouble finding a private lawyer acceptable to him who is willing to take his case and pursue it with zeal. One commentator recently observed: "If lawyers for nonpaying clients cannot be induced through a system of incentives to represent their clients zealously, the right to counsel may become a useless cosmetic that insults more than it serves the interests of the clientele. The reputation of the bar is a matter of interest to the community as a whole, for it is unlikely that the public's regard for the law itself can long survive disdain for the

CONTRASTING VIEWS

It is argued that life-story fee contracts are inherently prejudicial, unethical, and against public policy and that the judge has power and the duty to protect the integrity of the trial and, thus, confidence in the judicial process. Do those concerns perhaps outweigh a single defendant's interest in chosen counsel?

Contracts of this kind are widely criticized. It is said they tempt lawyers, consciously or subconsciously and adversely to the client's interests, to tilt the defense for commercial reasons. (See, e.g., *Wojtowicz* v. *United States* (2d Cir. 1977) 550 F.2d 786, 793, cert. den. 431 U.S. 972 [53 L.Ed.2d 1071, 97 S.Ct. 2938]; *Ray* v. *Rose* (6th Cir. 1976) 535 F.2d 966, 974, cert. den., 429 U.S. 1026 [50 L.Ed.2d 629, 97 S.Ct. 648]; *United States* v. *Hearst* (N.D.Cal. 1978) 466 F.Supp. 1068, 1083 [53 A.L.R.Fed. 110] revd. on other grounds (9th Cir. 1980) 638 F.2d 1190, 1193, cert. den. (1981) 451 U.S. 938 [68 L.Ed.2d 325, 101 S.Ct. 2018]; *People* v. *Corona, supra*, 80 Cal.App.3d 684, 720; ABA Code of Prof. Responsibility, EC (Ethical Consideration) 5-4; ABA Proposed Model Rules of Prof. Conduct, rule 1.9(d) and com. thereto.)[5] They do present a threat that counsel might provide deficient representation. They also raise questions under the California Rules of

---

craftsmanship of those who administer it." (Carrington, *The Right to Zealous Counsel*, 1979 Duke L.J. 1291, 1307-1308; cf., Wheeler & Wheeler, *Reflections on Legal Representation of the Economically Disadvantaged: Beyond Assembly Line Justice* (1980) 26 Crime & Delinquency 319.)

We should not callously foreclose an indigent's right to use the means at his disposal to provide the necessary incentives. (See *Crovedi, supra*, 65 Cal.2d at pp. 207-208.)

[5]EC (Ethical Consideration) 5-4 provides: "If, in the course of his representation of a client, a lawyer is permitted to receive from his client a beneficial ownership in publication rights relating to the subject matter of the employment, he may be tempted to subordinate the interests of his client to his own anticipated pecuniary gain. For example, a lawyer in a criminal case who obtains from his client television, radio, motion picture, newspaper, magazine, book, or other publication rights with respect to the case may be influenced, consciously or unconsciously, to a course of conduct that will enhance the value of his publication rights to the prejudice of his client. To prevent these potentially differing interests, such arrangements should be scrupulously avoided prior to the termination of all aspects of the matter giving rise to the employment, even though his employment has previously ended."

DR (Disciplinary Rule) 5-103(A) provides: "A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client [with exceptions irrelevant here] ...."

The comment to proposed rule 1.9(d) currently provides: "An agreement by which a lawyer acquires literary rights concerning the subject matter of the representation involves incompatible standards for the lawyer's performance, one being effectiveness in representing the client and the other being performance that has literary value...."

Professional Conduct.[6] (Cf. Comment, *The Lawyer's Moral Paradox* 1979 Duke L.J. 1335.[7])

Some precedents recognize a court's power to recuse an attorney so as to help ensure a fair trial and preserve judicial integrity. *Comden* v. *Superior Court* (1978) 20 Cal.3d 906 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562] approved a judge's order that attorneys withdraw from a civil case because a member of their firm would likely be a witness. The majority noted that generally both California and American Bar Association standards required withdrawal of an attorney in those circumstances. "[U]ltimately the issue involves a conflict between a client's right to counsel of his choice and the need to maintain ethical standards of professional responsibility. 'The preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount .... [The client's recognizably important right to counsel of his choice] must yield, however, to considerations of ethics which run to the very integrity of our judicial process.' ..." (P. 915.)

*People* v. *Superior Court* (*Greer*) (1977) 19 Cal.3d 255 [137 Cal. Rptr. 476, 561 P.2d 1164] upheld dismissal of a district attorney on grounds of personal bias against defendant. The opinion stressed the trial court's strong interest in assuring the prosecutor's impartiality and noted inter alia the American Bar Association's stricture against prosecutorial conflicts of interest. (Pp. 263-264, 269.)

Occasionally this court has isolated instances in which *appointed* counsel faced potential conflicts so inherent and serious as to invalidate

---

[6]California Rules of Professional Conduct, rule 5-101 provides: "A member of the State Bar shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the member of the State Bar acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms which should have reasonably been understood by the client, (2) the client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto."

The disclosure and the attorney-advice provisions of the contract in this case are a patent attempt to comply with the California rule.

[7]Several states have laws providing that any proceeds from commercial exploitation of one's crimes shall be paid into state-supervised escrow funds for disbursement to victims and for legal defense. (E.g., Ariz.Rev.Stats. (1978) §§ 13-4201, 13-4202; Ga.Code Ann. (1981 Supp.) § 27-3401; Ill.Ann.Stats. (1981-1982 Supp.) 70 ¶ 403 et seq.; N.Y.Exec.Law (1980-81 Supp.) § 632-a.) A similar proposal failed in the California Legislature. (Assem. Bill No. 2635 (1977-1978 Reg. Sess.).)

any subsequent conviction, regardless of proof of adverse effect on counsel's performance in the case. *People* v. *Rhodes* (1974) 12 Cal.3d 180 [115 Cal.Rptr. 235, 524 P.2d 363] held that a city attorney with prosecutorial responsibilities may not be appointed to defend indigent criminal defendants. And in *People* v. *Barboza* (1981) 29 Cal.3d 375 [173 Cal.Rptr. 458, 627 P.2d 188] we found "inherent and irreconcilable conflicts" in a budgetary scheme that discouraged the public defender from urging his own disqualification in multiple-representation cases. (P. 381.)

None of those cases compels or authorizes a dismissal here. In *Greer* defendants filed the recusal motion; there was no question of any dismissal over their objection or of intrusion on their right to chosen counsel. Moreover, disqualification of a biased prosecutor was justified on the ground that his duties extended far beyond those of the typical advocate. Because he represented a sovereignty with paramount responsibility for penal fairness his impartiality was fundamental to the truth-finding goal of the criminal justice system. (19 Cal.3d at pp. 266-267.)

*Rhodes* and *Barboza* addressed defendants' posttrial challenges to their appointed counsel. Again no interference with chosen legal representatives was involved. We stressed in *Barboza* that the hidden conflict inherent in the budget provisions there at issue "would be more readily apparent" to defendants who had retained their attorneys. (P. 379.)[8]

---

[8]The budget system attacked in *Barboza* was a "direct ... financial disincentive for the public defender either to investigate or declare the existence of actual or potential conflicts of interest requiring employment of other counsel." (29 Cal.3d at p. 379.) The conflict was not "tenuous" because the defender's budget and income were "directly affected by his determination of whether a conflict of interest exists ..." (*id.*, at p. 380), creating a "real and insoluble tension" between counsel's professional and financial motives (p. 381).

A life-story agreement creates no such inherent or inevitable conflict. The contract here discloses that the value of petitioner's story might benefit from a long, sensational trial leading to conviction and death. It seems not unlikely, though, that counsel's self-interests might best be served by a careful, diligent defense that avoids conviction or minimizes the penalty. A quiet strategy that succeeds may well make a better story than a flamboyant failure. Counsel's reputation, a precious professional and commercial asset, is enhanced; and the risks of professional discipline and demeaning criticism are reduced. Also, it may be commercially prudent to keep lurid facts confidential until the legal battle has ended.

Justice Files' dissenting remarks in the Court of Appeal are particularly apt: "Although the literary rights contract is not a common experience for attorneys, the kind of 'conflict' discussed here is not at all unusual.... [A]lmost any fee arrangement between attorney and client may give rise to a 'conflict.' An attorney who received a flat fee in advance would have a 'conflicting interest' to dispose of the case as quickly as possible, to the client's disadvantage; and an attorney employed at a daily or hourly

*Comden, supra,* 20 Cal.3d 906, suggested that in civil matters the right to chosen counsel may be weighed strictly against competing considerations of conflict of interest, professional ethics, and judicial integrity.[9] ■ We now conclude, however, that, with exceptions set forth in this opinion, the mere possibility of a conflict does not warrant pretrial removal of competent counsel in a criminal case over defendant's informed objection.[10] When the possibility of significant conflict has been brought to the court's attention and the danger of proceeding with chosen counsel has been disclosed generally to defendant, he may insist on retaining his attorneys if he waives the conflict knowingly and intelligently for purposes of the criminal trial.[11] To the extent *People* v. *Municipal Court (Wolfe)* (1977) 69 Cal.App.3d 714, 719-720 [138 Cal.Rptr. 235] suggests a contrary conclusion it is disapproved.

---

rate would have a 'conflicting interest' to drag the case on beyond the point of maximum benefit to the client.

"The contingent fee contract so common in civil litigation creates a 'conflict' when either the attorney or the client needs a quick settlement while the other's interest would be better served by pressing on in the hope of a greater recovery. The variants of this kind of 'conflict' are infinite. Fortunately most attorneys serve their clients honorably despite the opportunity to profit by neglecting or betraying the client's interest."

[9]*Comden*'s application even to civil cases is weakened by developments in response to this court's opinion. Effective November 1, 1979, the State Bar has liberalized the rule on attorney-witnesses. Counsel need no longer withdraw from either a civil or criminal case if the client consents in writing to continued representation after (1) full disclosure of the implications of counsel's dual role as advocate and witness, and (2) an opportunity to seek independent legal advice—protections analagous to those accorded petitioner here. (Rules Prof. Conduct, rule 2-111(A)(4), as amended.) Thus *the State Bar has concluded that a fully informed client's right to chosen counsel outweighs potential conflict or threat to trial integrity posed by counsel's appearance as witness.* And it has determined also that counsel's dual participation under the circumstances is not unethical.

[10]We do not deprive the trial court of power to act when an actual conflict materializes during the proceedings, producing an obviously deficient performance. Then the court's power and duty to ensure fairness and preserve the credibility of its judgments extends to recusal even when an informed defendant, for whatever reason, is cooperating in counsel's tactics. (See *Cannon* v. *Commission on Judicial Qualifications, supra,* 14 Cal.3d 678, 697; *Smith* v. *Superior Court, supra,* 68 Cal.2d 547, 559.) No such facts appear here.

[11]Prior California decisions seem to assume that the right to counsel unhindered by conflicts may be waived. (See, e.g., *In re Hochberg* (1970) 2 Cal.3d 870, 878 [87 Cal.Rptr. 681, 471 P.2d 1]; *People* v. *Chacon, supra,* 69 Cal.2d 765, 774.) The federal decisions are clearer. They affirm that conflicts may be waived and, if waived, provide no federal constitutional ground for attack on a conviction. (*Holloway* v. *Arkansas, supra,* 435 U.S. 475, 483, fn. 5 [55 L.Ed.2d 426, 433]; see also *Wood* v. *Georgia* (1981) 450 U.S. 261 [67 L.Ed.2d 220, 101 S.Ct. 1097]; *Cuyler* v. *Sullivan, supra,* 446 U.S. 335, 346-347 [64 L.Ed.2d 333, 345-346]; *Glasser* v. *United States, supra,* 315 U.S. 60, 70 [86 L.Ed. 680, 699].)

Nothing in *People* v. *Chadd* (1981) 28 Cal.3d 739 [170 Cal.Rptr. 798, 621 P.2d 837] (cert. den. *sub nom. California* v. *Chadd* (1981) 452 U.S. 931 [69 L.Ed.2d 431, 101

■ As in other cases involving forfeiture of the right to counsel, waiver of potential conflicts may not be inferred from a silent record. (*Carnley* v. *Cochran* (1962) 369 U.S. 506, 516-517 [8 L.Ed.2d 70, 77-78, 82 S.Ct. 884]; *Chacon, supra,* 69 Cal.2d 765, 774.) When substantial risks of conflict are brought to the court's attention before trial but an adequate waiver of defendant's effective-assistance rights cannot be obtained on the record, the court must presume that he has not knowingly and intelligently chosen to proceed with retained counsel. (See *People* v. *Carter* (1967) 66 Cal.2d 666, 670 [58 Cal.Rptr. 614, 427 P.2d 214].) The court may then protect the record and defendant's right to effective assistance by requiring counsel's withdrawal. (See *United States* v. *Dolan* (3d Cir. 1978) 570 F.2d 1177, 1182; Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney* (1978) 62 Minn.L.Rev. 119, 148-151.)[12]

---

S.Ct. 3066] or *People* v. *Stanworth* (1969) 71 Cal.2d 820 [80 Cal.Rptr. 49, 457 P.2d 889] indicates that defendant lacks power to waive counsel's potential conflicts of interest. *Chadd* held only that a capital defendant cannot circumvent his statutory disability to plead guilty without consent of counsel. (Pp. 746-755; see Pen. Code, § 1018.) *Stanworth* ruled that no one may divest this court of its statutory and constitutional duty to review a death judgment against him. (Pp. 832-834; see Cal.Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).) In both cases the state has asserted an overriding public interest in full examination of capital charges and sentences, even where the person accused or condemned wishes not to resist. The state has demonstrated no parallel desire to overrule a defendant who, with full information, chooses to make a vigorous defense through counsel in whom he has special confidence.

When a conflict is validly waived, defendant may still argue on appeal that he received ineffective assistance for reasons unrelated to the conflict. Because of the difficulty of isolating errors motivated by conflicts and because defendant has created the problem by his knowing insistence on conflicted counsel, the burden should be on him to show that deficiencies he later asserts did not arise from the conflict.

[12]Our holding that disclosed but unwaived conflicts justify recusal does not contravene *Smith, Chacon,* or *Cook, supra. Smith* dealt with an unreasonable *sua sponte* conclusion by the trial court that counsel was incompetent; there we saw no need for removal. Though we stressed defendant's repeated objections to recusal, the issue of waiver of effective assistance never arose. *Cook*'s suggestion that judges may never interfere with a choice of conflicted counsel was dictum since the case concerned trial prejudice. Again the issue of waiver was not confronted. In *Chacon* we held that prejudice arising from conflicted representation could be asserted on appeal. But there a silent record forced the conclusion that the conflict had not been waived, and the trial court had not attempted to remove conflicted counsel.

With recent guidance from the United States Supreme Court we now reaffirm that judges need not inquire about conflicts affecting retained counsel unless, as here, the issue is raised by counsel or a party. Counsel has the responsiblity to advise both client and court of potential conflicts as soon as they arise. Where this duty is breached and trial proceeds without disclosure and formal waiver, defendant may of course argue that a conflict of interest did adversely affect counsel's efforts in his behalf. (*Cuyler* v.

In this case, extensive pretrial disclosures about conflicts arising from the fee contract were made on the record to both petitioner and court. Yet petitioner insisted on proceeding with his counsel. Did that insistence constitute an adequate waiver, precluding counsel's removal? We believe that it did.

In determining whether a waiver of potential conflicts is knowing, intelligent, and unconditional, the trial court must "navigate adroitly between the Scylla of denying a defendant the right to determine his own fate and the Charybdis of violating his right to counsel. . . ." (See *Carter, supra,* 66 Cal.2d at p. 667.) Some federal cases have implied that the court's inquiry must separately explore each foreseeable conflict and consequence and that defendant's waiver may extend only to matters discussed in detail on the record. (E.g., *United States* v. *Eaglin* (9th Cir. 1977) 571 F.2d 1069, 1086 [49 A.L.R.Fed 786]; *United States* v. *Dolan, supra,* 570 F.2d 1177, 1181-1182; *United States* v. *Garcia* (5th Cir. 1975) 517 F.2d 272, 278.) It also has been suggested that defendant must express in his own words his understanding of what he has been told. (*Dolan, supra,* at p. 1182; *Garcia, supra,* 517 F.2d 272, 278; cf., Fed. Rules Crim. Proc., rule 11.)

Rules that are that strict seem neither necessary nor workable. Not all imaginable consequences of a conflict that inheres in a life-story contract can be predicted before trial. Indeed, much of the information needed to assess the impact of the conflict on defendant's case may be privileged. (See *Cook, supra,* 13 Cal.3d at p. 672, fn. 7; *Dolan, supra,* at pp. 1181-1182; Geer, *supra,* 62 Minn.L.Rev. at pp. 148-151.) In the parallel area of self-representation, waivers have been deemed sufficient where defendant was warned of the general danger of proceeding on his own. (See, e.g., *People* v. *Teron* (1979) 23 Cal.3d 103, 108-109 [151 Cal.Rptr. 633, 588 P.2d 773]; *People* v. *Lopez* (1977) 71 Cal.App.3d 568, 573 [138 Cal.Rptr. 36].)

The trial court's procedure here, we think, sufficiently established that petitioner was competent to waive his rights. The judge examined a psychiatric evaluation, and the record suggests neither mental nor emotional incapacity. (See *Teron* and *Lopez,* both *supra.*) The judge also acted properly by referring to the disclosure provisions of the agreement

*Sullivan, supra,* 446 U.S. 335, 348 [64 L.Ed.2d 333, 346]; *Holloway* v. *Arkansas, supra,* 435 U.S. 475, 485-486 [55 L.Ed.2d 426, 435-436]; *Cook, supra,* 13 Cal.3d at p. 670; *Chacon, supra,* 69 Cal.2d at pp. 775-776.)

and carefully determining that petitioner had read and understood each one. Those provisions explained the basic problem—that counsel's economic motivations might run counter to petitioner's trial concerns. They warned that counsel might be tempted in specified ways to sabotage petitioner's defense. They also cautioned that not all problems could be foreseen. Waiver of the consequences of potential conflict was not inadequate simply because neither the court nor the agreement undertook the impossible burden of explaining separately every conceivable ramification. We therefore conclude that the trial court's order recusing the chosen counsel must be overturned.

CONCLUSION

We stress that our opinion connotes no moral or ethical approval of life-story fee contracts. We have addressed only this narrow question: May a criminal defendant (here charged with capital crimes) be denied his right to representation by retained counsel simply because of potential conflicts or ethical concerns even when he has asserted, after extensive disclosure of the risks, that he wishes to proceed with his chosen lawyers and no others? Our answer is No.[13]

Let a writ of mandate issue directing respondent court to vacate its order discharging Messrs. Pierpont M. Laidley, Walter Alschuler, and Fred Alschuler as attorneys of record for the defendant in Los Angeles Superior Court action No. A350010 and to enter any and all orders necessary to reinstate them as defense attorneys in that action.

Mosk, J., Broussard, J., and Tobriner, J.,* concurred.

KAUS, J.—I concur in the result reached in Justice Newman's lead opinion, although I had hoped that our opinion would find harsher language respecting the "life story" contract's propriety as well as its

---

[13]As Justice Files observed below: "I do not disagree with EC 5-4 of the American Bar Association's Code of Professional Responsibility, which declares that the kind of contract which is here involved 'should be scrupulously avoided.' But we are here dealing with a fact and not a theory. The defendant and his attorneys have made the contract. The question now is whether this defendant, charged with four capital offenses, shall be deprived of his chosen attorneys and forced to accept the trial court's choice who, in the words of the Faretta court: "'represents" the defendant only through a tenuous and unacceptable legal fiction.'"

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

enforceability. If we indicated not only that the contract is ethically flawed, but also that we doubt its efficacy as a vehicle for compensating counsel, the issue before us now would probably never recur.

My reason for joining in the result reached by Justice Newman's opinion is that I do not perceive it to be the duty of trial courts to act as an arm of the State Bar Court and specifically enforce professional ethics by recusing counsel. (See dis. opn. of Justice Manuel in *Comden* v. *Superior Court* (1978) 20 Cal.3d 906, 919 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562].)

Although it appears to me that Maxwell has adequately waived any conflict inherent in the contract, I am under no illusion that, if convicted, he will not raise the conflict as a ground for reversal. It will have to be dealt with at that time. The notion that trial courts can prophylactically prevent attorney-client issues from being raised on appeal or in collateral proceedings is, unfortunately, Utopian.

**BIRD, C. J.,** Concurring and Dissenting.—The right to counsel of one's own choice is one of this nation's most fundamental freedoms. (See *People* v. *Holland* (1978) 23 Cal.3d 77, 86 [151 Cal.Rptr. 625, 588 P.2d 765].) This court has been diligent in its efforts to ensure that all our citizens, regardless of their status in life, have the opportunity to be defended by counsel of their choice. (See *Harris* v. *Superior Court* (1977) 19 Cal.3d 786 [140 Cal.Rptr. 318, 567 P.2d 750]; *People* v. *Byoune* (1966) 65 Cal.2d 345 [54 Cal.Rptr. 749, 420 P.2d 221]; *People* v. *Crovedi* (1966) 65 Cal.2d 199 [53 Cal.Rptr. 284, 417 P.2d 868].)

In our criminal justice system, the poor have basically two choices. They can accept court-appointed counsel or make some arrangement with private counsel that ensures that counsel will receive some remuneration for the services rendered. One of the problems this case underscores is the fact that our courts do not properly or completely compensate appointed counsel for the work they perform. As a result, if an attorney in the private practice of the law accepts a court appointment, it usually means that the attorney will be less than fully compensated for his or her work.

In a complex and serious case such as the one before the court, it may not be economically feasible for counsel to accept a court appointment. Therefore, the only way in which an indigent may be able to secure counsel of his choice may be through a "life story" arrangement.

For this court to hold *any* "life story" agreement, regardless of its contents, impermissible would be to foreclose to the indigent perhaps the only opportunity he may have to secure counsel of his choice. At the same time, counsel should not exploit the circumstances in which the accused finds himself. If the only "money" the accused has is the potential profit from publishing his story, counsel should be scrupulous in any retainer agreement of this type. Exploitation of the poor and powerless is not unique to this society. However, members of the legal profession are sworn to uphold and defend the rights enumerated in our Constitution. They should never be a party to their violation.

I agree with those portions of the majority opinion which hold that (1) a "life story" agreement is not an impermissible means by which a person accused of crime may retain an attorney but (2) the accused must "knowingly and intelligently" waive on the record the potential conflicts flowing from this arrangement. (Maj. opn., *ante*, at p. 619.)

I have grave misgivings about permitting an accused to waive a right if he has not been given specific, understandable, and detailed information sufficient to enable a person untrained in the law to make a truly knowing and intelligent decision. A mere statement of "the basic problem" and a recitation that "not all problems could be foreseen" might suffice if the decision were to be made by a legal scholar. However, they are woefully inadequate when the decision-maker is a criminal defendant unschooled in the law.

The *Faretta* line of cases is inappropriate here. (Cf., *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].) Petitioner Maxwell is a layman. He does not seek to represent himself for he does not believe—even superficially—that he is competent to understand or deal with the legal system without the assistance of counsel. He needs and wants skilled legal assistance. Where questions arise as to a potential inadequacy in that very assistance, Maxwell cannot be expected to be aware of the magnitude and ramifications of the problem without the assistance of someone skilled in the law. Further, he cannot be deemed to have waived his right to obtain that knowledge.

The deficiencies in the record of the present case highlight the problem. At no point has petitioner been told that by accepting these particular attorneys with their potentially conflicting interests, he could be losing his right to assert certain issues on appeal. For example, he could be precluded from obtaining a reversal on the basis of inadequacy of

counsel if that claim were based upon the conflicts waived by him at the trial court level. This could be a substantial limitation of petitioner's appellate rights, yet he has not been informed of it. An intelligent and knowing waiver of those rights was never elicited.

Moreover, the "life story" agreement signed by petitioner may well adversely affect other protections he might otherwise enjoy. In section 37 of the agreement, petitioner has agreed to "waive upon demand by Lawyers the so called attorney-client privilege and *any and all other privileges* and rights which would prevent the full and complete exercise and exploitation of the rights granted to Lawyers herein." (Italics added.) No specific mention has been made to petitioner of the impact of this provision on his privilege against self-incrimination, nor indeed has the attorney-client privilege been explained elsewhere.

To a person trained in the law, a host of legal problems come easily to mind. Suppose, for example, that petitioner is convicted, but the conviction is reversed on appeal and remanded for retrial. Under the terms of the agreement, these counsel are not obligated to represent him at any stage beyond the present superior court proceedings. If they decide not to represent him in the retrial proceedings, they may demand that he waive his privilege prior to the retrial.

Indeed, if counsel speak with petitioner at *any* time after their representation terminates—the agreement seems to allow counsel to demand such cooperation—no privilege will protect petitioner's statements to them. The prosecution may obtain those statements simply by serving a subpoena on the attorneys.

None of these issues was ever explored with petitioner, either in the written agreement or at the court hearing on the issue of recusal. In sum, I do not believe that this record establishes a knowing and intelligent waiver by petitioner of his right to a counsel whose interests are not in potential conflict with his own.

A peremptory writ should issue directing the trial court to conduct further hearings at which petitioner would be given an adequate advisement of all the conflicts and potential consequences. Then, petitioner may decide whether or not he wishes to be represented by these particular attorneys. (See *United States* v. *Dolan* (3d Cir. 1978) 570 F.2d 1177, 1180-1182; *United States* v. *Gaines* (7th Cir. 1976) 529 F.2d

1038, 1043-1044; *United States v. Garcia* (5th Cir. 1975) 517 F.2d 272, 276-278.)

**RICHARDSON, J.**—I respectfully dissent. The 19-page attorney retainer agreement drafted by defendant's attorneys created, from the moment of its inception, irreconcilable conflicts of interest which fully justified the trial court's action in recusing the attorneys. In my view, as between defendant's right to counsel of choice and the court's duty to assure defense representation free of conflicting interests, the latter is more important.

The retainer agreement in question contains several troubling features: (1) Attorneys are given the full ownership, "irrevocably, absolutely and forever," of defendant's life story, unlimited as to type of story, nature of media use, geographic territory for exploitation, and duration, and covering "all events," past, present and future in Maxwell's life (¶ 28); (2) the attorneys are to receive 85 percent of the net proceeds realized from defendant's life story, and 15 percent is to go to defendant (¶ 39); (3) the attorneys' services do not include an appeal (¶ 24); (4) defendant's obligation for compensation arises immediately and vests in the attorneys irrevocably (¶ 22); (5) defendant waives the "attorney-client privilege and any and all other privileges and rights which would prevent the full, immediate and complete exercise and exploitation of the rights granted to lawyers" (¶ 37); and (6) defendant waives all claims for defamation for intrusion on his privacy or "anything else by reason of anything contained in [his life] story" (¶ 38).

There are several reasons why such an agreement should not be sanctioned. It contains both the reality and the appearance of fatally conflicting interests. The terms of the contract, if performed, would deny defendant significant present and future procedural protections. Contracts of this kind have been widely condemned on general ethical grounds. If implemented, such agreements would seriously erode the integrity of the judicial system. The contract should be invalidated as a judicially declared rule of criminal procedure.

### THE RIGHT TO CHOSEN COUNSEL

While defendant's right to counsel of his own choice is an important right it is neither constitutionally ordained nor absolute. It must yield to weightier considerations when necessary to preserve judicial integrity and assure public respect for the administration of justice. Due process

principles require that assistance of counsel must be *"effective."* (*Reece v. Georgia* (1955) 350 U.S. 85, 90 [100 L.Ed. 77, 83, 76 S.Ct. 167], italics added; see *Glasser* v. *United States* (1942) 315 U.S. 60, 70 [86 L.Ed. 680, 699, 62 S.Ct. 457].) Moreover, "We have repeatedly held that constitutional and statutory guarantees are not violated by the appointment of an attorney other than the one requested by defendant." (*Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 934 [106 Cal.Rptr. 506 P.2d 1007], cert. den., 414 U.S. 979 [38 L.Ed.2d 223, 94 S.Ct. 272]; *People* v. *Hughes* (1961) 57 Cal.2d 89, 98-99 [17 Cal.Rptr. 617, 367 P.2d 33].) In reaching this conclusion courts have stressed two major "values" integral to the judicial system. An appellate court aptly observed recently: "[T]he right of an accused to retain defense counsel of his choice is not absolute, there being other values of substantial importance which may also demand recognition.... One such value is the preservation of public confidence in the integrity and impartiality of our criminal justice system, and here it should prevail." (*People* v. *Municipal Court* (*Wolfe*) (1977) 69 Cal.App.3d 714, 719-720 [138 Cal.Rptr. 235].) Emphasizing a second vital consideration, a federal opinion has noted: "The right to effective representation by counsel whose loyalty is undivided is so paramount in the proper administration of criminal justice that it must in some cases take precedence over all other considerations, including the expressed preference of the defendants concerned and their attorney." (*United States* v. *Carrigan* (2d Cir. 1976) 543 F.2d 1053, 1058, conc. opn. Lumbard, J.)

Defendant faces the most serious of criminal charges with the gravest of possible consequences. He requires counsel, not only of unquestioned professional competence (*People* v. *Pope* (1979) 23 Cal.3d 412, 423-425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]), but also counsel whose allegiance to him is total and unalloyed, free of the subtle, opposing magnetic pull of self-interest or adverse pecuniary advantage. This, the majority refuses to assure.

## THE CONFLICTING INTERESTS

What are the conflicting interests which are created by this retainer agreement? The agreement itself frankly acknowledges that it "may create a conflict of interest between Maxwell and the lawyers, and that the provisions of this agreement may give the lawyers a monetary interest adverse to the interests of Maxwell." Interestingly, counsel in

paragraph 14 in novel and clinical fashion describe three specific areas of conflict:

"a. The lawyers may have an interest to create publicity which would increase the money which they might get as a result of this agreement, even if this publicity hurt Maxwell's defense.

"b. The lawyers may have an interest not to raise certain defenses which would question the sanity or mental capacity of Maxwell because to raise these defenses might make this agreement between the lawyers and Maxwell void or voidable by Maxwell.

"c. The lawyers may have an interest in having Maxwell be convicted and even sentenced to death so that there would be increased publicity which might mean that the lawyers would get more money as a result of this agreement." Counsel then promise (¶ 14(d)), however, that they will not take advantage of defendant or pursue any adverse interests, but rather will diligently serve him. I have no doubt that they will try to do so. Moreover, I do not question their good faith in testing the permissible ethical limits of the instrument which they have drawn, although I deplore the very lengthy procedural delay thereby caused to the trial of the merits of this case.

Nonetheless, the agreement crosses the line of propriety. The solemn assurances expressed in paragraph 14(d) to resist the commercial opportunities do not purge the instrument of its taint. Such promises are simply commitments to do what the law already requires, adding nothing to counsel's continuing, preexisting fiduciary duties. The opportunity for, and the appearance of, mischief are the twin evils here. The pressure of self-interest is generated by an agreement which provides that counsel's only compensation will come from the commercial exploitation of defendant's life story. This self-interest thus created at the inception of the contract is ever present to sway, if unconsciously, the numerous decisions of counsel both pretrial and during trial.

Very recently a similar tension arising from divided loyalties prompted us in *People* v. *Barboza* (1981) 29 Cal.3d 375, 381 [173 Cal.Rptr. 458, 627 P.2d 188], to disapprove a contractual relationship which by its own terms created personal financial interests opposing professional obligation. We stressed that it is necessary that counsel avoid "'any relation which would prevent him from devoting his entire energies to his

client's interests,' . . ." (*Id.*, at p. 379, quoting *Anderson* v. *Eaton* (1931) 211 Cal. 113, 116 [293 P. 788].) In invalidating an agreement with a public defender we emphasized that "the contract places him in a situation with grave consequences and implications for the administration of justice. Not only is there an 'appearance of impropriety,' there is also a real and insoluble tension, created by the contract between the defender's conflicting interests." (*Id.*, at p. 381.) Similar reasoning applies where, as here, the personal financial interests of counsel are at stake.

In like fashion, examining posttrial a similar literary agreement between counsel and client, the court in *People* v. *Corona* (1978) 80 Cal. App.3d 684, 720 [145 Cal.Rptr. 894], reversed a conviction stating: "[I]t is indisputable that by entering into the literary rights contract trial counsel created a situation which prevented him from devoting the requisite undivided loyalty and service to his client. From that moment on, trial counsel was devoted to two masters with conflicting interests—he was forced to choose between his own pocketbook and the best interests of his client, the accused."

The scope of the conflicts "built in" to the agreement exceeds those acknowledged by the attorneys themselves in paragraph 14. The real vice of the arrangement appears most clearly in considering certain tactical decisions which may confront trial counsel. Suppose that before trial, through a plea bargain, defendant's life may be saved by an informed entry of a guilty plea to certain of the multiple counts, including murder, with which he is charged. Should counsel recommend such a bargain? Perhaps they should, but *would* they, knowing that the sales value of a book or television manuscript would decline if there was no dramatic trial testimony elicited? How really objective will counsel be in exploring the opportunities for avoiding trial without any attendant publicity if the commercial value of defendant's life story is thereby reduced or destroyed? If defendant is tried, should he be called as a witness to tell his "story," or exercise his constitutional right to remain silent, thereby putting "the prosecution to its proof"? Surely, the sales value of defendant's story would be affected by the decision. If defendant takes the stand during trial would the areas of his direct examination be affected, however subtly, perhaps unknowingly, by counsel's financial interest in the drama and salability of his testimony? As anticipated in paragraph 14(b), would the existence of the contract affect a decision to assert an insanity defense with its inherent threat to the validity of the agreement?

In summary, decisions and strategy may be affected by motives which are antithetical to defendant's basic right to effective counsel. Moreover, there is no clear evidence that defendant fully understands the legal implications of his purported waiver.

The case is before us pretrial. Accepting counsel's good faith assurances that they will not exploit any opportunities afforded them by their agreement, how will we know if they so restrain themselves? The United States Supreme Court, focusing on the attorney's role in the plea bargaining function alone, noted in *Holloway v. Arkansas* (1978) 435 U.S. 475, 490-491 [55 L.Ed.2d 426, 438, 98 S.Ct. 1173], "[I]t would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible." In similar fashion, how is a trial court, honestly and fairly, to identify and trace the motives, selfish or altruistic, hidden or express, behind the myriad decisions pretrial and at trial made by counsel in a multiple murder case? The inescapable fact is that defendant will have no way of knowing, and neither the trial nor appellate court is in a better position to judge.

Rule 5-101, Rules of Professional Conduct of the State Bar of California, binding on all California lawyers, provides in relevant part: "Avoiding Adverse Interest. A member of the State Bar shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the member of the State Bar acquires the interest *are fair and reasonable to the client* and are fully disclosed and transmitted in writing to the client in manner and terms which should have reasonably been understood by the client, (2) the client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto." (Italics added.)

The majority of the Court of Appeal rejected the present agreement and applied the "fair and reasonable" strictures of the foregoing rule 5-101 to the contract's paragraph 37 which recites: "Maxwell does hereby agree to *waive* upon demand by Lawyers the so called *attorney-client privilege and any and all other privileges and rights which would prevent the full and complete exercise and exploitation of the rights granted to Lawyers* herein." The appellate court appropriately noted that paragraph 37 provides for "an *advance* waiver [which]

might well inhibit Maxwell from fully disclosing to his retained lawyers all information that could be helpful in his defense. The confidential relationship between attorney and client is at the heart of a proper functioning of our judicial system. A compelled waiver of this privilege for the purpose of advancing the fee interest of the attorney cannot be tolerated."

Although the majority (*ante*, p. 610, fn. 1) recites that "counsel conceded that [¶ 37] ... overreaches," neither the extent nor the effect of the concession is clear. Moreover, paragraph 33 of the contract remains. In it defendant "promises, covenants and agrees to assist the lawyers at any and all times and in any and all ways permissible by law in the protection, exercise, and exploitation of their rights to the Story." Defendant additionally agrees fully to disclose any relevant material to the lawyers or their designated agents to further the lawyers' rights to his story. Thus, there remains the *substance* of a waiver of the attorney-client privilege.

Further, I am unable to reconcile the language and spirit of paragraph 33 with the following mandate of Business and Professions Code section 6068: "It is the duty of an attorney: ... [¶] (e) To maintain inviolate the confidence, and at every peril to himself to preserve the secrets, of his client."

Finally, another inescapable fact remains—attorneys have agreed to represent Maxwell only during trial. What is to prevent them from publicly utilizing every bit of information that they have gleaned during trial preparation and trial at the same time that defendant is appealing from a judgment of conviction? The appellate briefs of the second attorney may be filed simultaneously with a book of the first attorneys aimed at the best seller list. Aside from the profound implications such a situation would have for the judicial system in general, what is there to protect defendant's rights during the appellate process and any subsequent retrial? At that point he will no longer be the "owner" of his life story, which will instead be in the hands of his former attorneys whose only remaining interest may be the promotion of sales.

### EROSION OF JUDICIAL AND PROFESSIONAL INTEGRITY

As a consequence of the intrinsic ethical difficulties raised by the contract, it seems to me self-evident that its judicial approval will inevi-

tably damage the integrity of both bench and bar. Not only does the contract permit, indeed invite, legal and tactical decisions which may be self-serving and contrary to the client's best interests, but the *appearance* of impropriety further taints the arrangement. As noted, an ethical shadow is cast over the lawyer-client relationship.

Both the reality and the image of the financial arrangement between attorneys and client are suspect, human nature and temptation being what they are. Contracts of the type herein presented will appear to the eye and ear of the average layman as indistinguishable from run-of-the-mill commercial or public relations agency agreements. In my view, the engrafting of this device on the judicial process will inevitably dilute public acceptance and understanding of legal advocacy founded on a fiduciary relationship of complete trust and confidentiality between attorney and client which is directed solely toward the advancement and vindication of the *client's* legal rights, not counsel's fiscal advantage. Counsel cannot simultaneously wear the hat of a literary or theatrical agent whose goal is commercial promotion and the hat of a counselor at law who is guided by strict ethical constraints.

My colleagues approve a contractual arrangement which has been specifically condemned by the American Bar Association (ABA) Code of Professional Responsibility. The ABA code, Ethical Consideration (EC) could not be more explicit: "EC 5-4 If, in the course of his representation of a client, a *lawyer is permitted to receive* from his client a *beneficial ownership in publication rights* relating to the subject matter of the employment, *he may be tempted to subordinate the interests of his client to his own anticipated pecuniary gain.* For example, a lawyer in a criminal case who obtains from his client television, radio, motion picture, newspaper, magazine, book, or other publication rights with respect to the case *may be influenced, consciously or unconsciously, to a course of conduct that will enhance the value of his publication rights to the prejudice of his client.* To prevent these potentially differing interests, *such arrangements should be scrupulously avoided* prior to the termination of all aspects of the matter giving rise to the employment, even though his employment has previously ended." (Italics added.)

Similarly, the latest Discussion Draft of ABA Model Rules of Professional Conduct, insists upon substantially higher professional standards. The proposed rules prohibit outright this form of contractual arrange-

ment, declaring: "An agreement by which a lawyer acquires literary rights concerning the subject matter of the representation *involves incompatible standards* for the lawyer's performance, one being effectiveness in representing the client and the other being performance that has literary value." (Comment, Proposed Rule 1.9(d), 48 U.S.L.Week, No. 32, p. 8, Feb. 19, 1980, italics added.) One federal court recently described life-story arrangements between attorney and client as "*a practice which deserves judicial condemnation.*" (*United States* v. *Hearst* (N.D.Cal. 1978) 466 F.Supp. 1068, 1083 [53 A.L.R. Fed. 110], affd. in part and vacated in part (9th Cir. 1980) 638 F.2d 1190, cert. den., *sub nom., Hearst* v. *United States* (1981) 451 U.S. 938 [68 L.Ed. 2d 325, 101 S.Ct. 2018], italics added.)

The rejection of such contracts is not new. Ten years ago the ABA Standards for Criminal Justice, the Prosecution Function and the Defense Function, Approved Draft 1971, supplement section 3.4 provided: "*It is unprofessional conduct* for a lawyer, prior to conclusion of all aspects of the matter giving rise to his employment, to enter into any agreement or understanding with a client or a prospective client by which he acquires an interest in publication rights with respect to the subject matter of his employment or proposed employment." (Italics added.)

To me, these collective ethical judgments are strongly persuasive. We should not affix our seal of judicial approval on that which "should be scrupulously avoided," or on that which "involves incompatible standards." We cannot sanction as "fair and reasonable to the client" under California Rules of Professional Conduct, rule 5-101, that "practice which deserves judicial condemnation" and which involves "unprofessional conduct for a lawyer." California citizens are entitled to ethical standards for their lawyers which are no lower than those of practitioners nationwide.

The maintenance of judicial integrity has been a fixed principle in our jurisprudence. (*Elkins* v. *United States* (1960) 364 U.S. 206, 215 [4 L.Ed.2d 1669, 1676, 80 S.Ct. 1437].) In California we have recently emphasized that "'It is essential that the public have absolute confidence in the integrity and impartiality of our system of criminal justice.'" (*People* v. *Superior Court (Greer)* (1977) 19 Cal.3d 255, 268 [137 Cal.Rptr. 476, 561 P.2d 1164], quoting from *People* v. *Rhodes* (1974) 12 Cal.3d 180, 185 [115 Cal.Rptr. 235, 524 P.2d 363].)

The majority's conclusion is also contrary to recent decisions by both this court and the federal courts. In *People v. Chadd* (1981) 28 Cal.3d 739 [170 Cal.Rptr. 798, 621 P.2d 837] (cert. den., *sub nom., California v. Chadd* (1981) 452 U.S. 931 [69 L.Ed.2d 431, 101 S.Ct. 3066]) we were faced with the question whether a defendant in a capital case could plead guilty without the concurrence of counsel. The *Chadd* majority placed heavy emphasis on the public interest involved, adding that "before *Faretta* [v. *California* (1975) 422 U.S. 806 (45 L.Ed.2d 562, 95 S.Ct. 2525)] this court squarely held that a capital defendant has no right to waive his automatic appeal: 'It is manifest that the state in its solicitude for a defendant under sentence of death has not only invoked on his behalf a right to review the conviction by means of an automatic appeal but has also imposed a duty upon this court to make such a review. *We cannot avoid or abdicate this duty merely because defendant desires to waive the right provided for him. In other contexts it has been held that a defendant's waiver or attempted waiver of a right is ineffective where it would involve also the renunciation of a correlative duty imposed upon the court.*' (*People v. Stanworth* (1969) 71 Cal.2d 820, 833 [80 Cal.Rptr. 49, 457 P.2d 889]; accord, *People v. Teron* (1979) ... 23 Cal.3d 103, 115, fn. 7 [151 Cal.Rptr. 633, 588 P.2d 773].)" (P. 752, italics added.)

California courts have repeatedly emphasized that "Although a defendant may waive rights which exist for his own benefit, he may not waive rights which belong also to the public generally." (*People v. Werwee* (1952) 112 Cal.App.2d 494, 500 [246 P.2d 704]; *People v. Stanworth, supra,* 71 Cal.2d 820, 833-834 and cases cited therein.) We have previously adhered to the basic principle enunciated in *Massie v. Sumner* (9th Cir. 1980) 624 F.2d 72, 74 (cert. den. (1981) 449 U.S. 1103 [66 L.Ed.2d 828, 101 S.Ct. 899]) and cited approvingly in *Chadd* (28 Cal.3d, at p. 753) that: "'The state of California has a strong interest in the accuracy and fairness of all its criminal proceedings.'" The majority now approves, however, a defendant's choice, over trial court rejection, of counsel whose legal representation of him is steeped in conflict—both potential and actual—by virtue of the retainer agreement. The result of the majority's new standard is to elevate a defendant's *choice* of counsel above the court's "correlative *duty,*" emphasized by us in *Stanworth,* to assure that he has effective counsel free of conflict.

The pivotal role of the judiciary in preserving unimpaired the fidelity of the justice system has been recently stressed by the United States

Supreme Court which put it this way: "In an adversary system of criminal justice, there is no right more essential than the right to the assistance of counsel. But that right has never been understood to confer upon defense counsel the power to veto the wholly permissible actions of the trial judge. It is the judge, not counsel, who has the ultimate responsibility for the conduct of a fair and lawful trial. '"[T]he judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct ...."'" (*Lakeside* v. *Oregon* (1978) 435 U.S. 333, 341-342 [55 L.Ed.2d 319, 326-327, 98 S.Ct. 1091].)

Defendant insists he wants particular counsel, and counsel want to represent him. Why do not defendant and counsel ask the trial court to appoint counsel with compensation for their services on the basis of standard fees? If the reason for refusing to follow this procedure is because of the loss of pecuniary gain to counsel from the contract, it is at this point, in my view, that the trial court, sensitive to the conflicting interests created by the agreement, watchful both for defendant's interests and the functioning reality and appearance of the criminal justice system was fully justified in declining to *accept* the agreement.

Not only is it the court which must make the ultimate decision, but as we have previously summarized: "[U]ltimately the issue involves a conflict between a client's right to counsel of his choice and the need to maintain ethical standards of professional responsibility. 'The preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount .... [The client's recognizably important right to counsel of his choice] must yield, however, to considerations of ethics which run to the very integrity of our judicial process.'" (*Comden* v. *Superior Court* (1978) 20 Cal.3d 906, 915 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R. 4th 562], cert. den., 439 U.S. 981 [58 L.Ed.2d 652, 99 S.Ct. 568].) The foregoing principle, expressed in a civil case, has even greater force when applied, as here, to a defendant who is faced with the most serious of criminal charges.

## FARETTA

I find unpersuasive the majority's argument, by analogy to *Faretta* v. *California, supra*, 422 U.S. 806, that because an independent right of self-representation exists, a defendant may therefore compel the trial court to accept his waiver of conflict-free counsel. Here defendant does

not waive counsel, but desires it. Unlike *Faretta*, the issue is a trial court's power to insist that defendant's representation be conflict-free.

### CONCLUSION

Long ago we established for California a very clear ethical position, which has guided the bench and bar ever since. This standard should be firm, fixed and immovable, mandating that "One of the principal obligations which bind an attorney is that of fidelity, the maintaining inviolate the confidence reposed in him by those who employ him, and at every peril to himself to preserve the secrets of his client. [Citations omitted.] This obligation is a very high and stringent one. . . . By virtue of this rule an attorney is precluded from assuming any relation which would prevent him from devoting his entire energies to his client's interests. Nor does it matter that the intention and motives of the attorney are honest. The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, *but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent.*" (*Anderson v. Eaton, supra*, 211 Cal., at p. 116, italics added.) These principles are as sound today as they were 50 years ago and we seriously err when we depart from them.

It is not enough for the majority to insist that it "does not approve 'life story' contracts." (*Ante*, p. 621.) With due respect, it seems to me inescapable that the majority *does* approve and sanction the agreement. Surely, the contract and defendant's "waivers" will be binding on defendant after trial if we condone them here. If the majority does not "approve" and declares invalid the present agreement, it should in candor so declare in order that the interested parties, both defendant and counsel, should be under no misapprehension.

Believing that both the public and those charged with criminal offenses in California are entitled to greater protection, I would invalidate and disapprove any and all similar attorney retainer agreements as a judicially declared rule of criminal procedure. (*People* v. *Barboza, supra*, 29 Cal.3d, at p. 381; *People* v. *Rhodes, supra*, 12 Cal.3d, at pp. 186-187; *People* v. *Vickers* (1972) 8 Cal.3d 451, 461 [105 Cal.Rptr. 305,

503 P.2d 1313]; *People* v. *Cahan* (1955) 44 Cal.2d 434, 442 [310 P.2d 661].)

Accordingly, I would sustain the action of the trial court in relieving counsel for defendant's protection.