Filed 10/15/13  P. v. Santana CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JIMMY SANTANA,<br><br>    Defendant and Appellant. | B241806<br><br>(Los Angeles County<br>Super. Ct. No. GA072199) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Candace J. Beason, Judge.  Affirmed.

Law Offices of Michael R. Kilts, Michael R. Kilts and Joseph P. Farnan for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jimmy Santana appeals from a judgment which sentenced him to 40 years to life in state prison for a drive-by shooting that left a 16-year-old victim unable to walk. Santana asserts the trial court committed multiple evidentiary errors. He also contends his constitutional rights were violated when trial testimony was read back to the jury outside of his presence. Last, Santana contends the trial court improperly denied his request, made after trial but before his sentencing, to substitute appointed counsel for retained counsel. We affirm.

## FACTS

The victim, John Doe, was shot at close range on January 12, 2008, which left him paralyzed from the waist down. Doe is African-American and was 16 years old at the time of the shooting. He was riding his bicycle home on Peck Road after buying snacks from a nearby store. He had noticed a burgundy-colored car turning onto a cross-street off of Peck Road while he rode to the store. He saw the same car driving towards him on Peck Road as he left the store near sundown. As he cycled in front of the Calvary Grace Church, where he worked part-time as a janitor, Doe heard the burgundy car pull up behind him. The car's passenger yelled, "Hey, fool. Fuck Dirt Rock." Dirt Rock was a derogatory term for the Duroc Crips, an African-American street gang in Monrovia.

When the car was arm's distance away to his left, Doe saw the passenger balance a gun on the passenger-side window. The driver concealed his face with his right arm and Doe could not identify him beyond the description that he was a pale-skinned male. Doe recognized the passenger with the gun as Santana even though a black beanie had been pulled down to his eyebrows. Doe had attended middle school with Santana. Santana fired the gun and Doe was struck in his lower left torso and right buttock. Doe lost feeling in his legs and fell to the ground. A driver stopped to call 911. Soon thereafter, Doe's father arrived at the scene. Doe then called his mother and 911. Doe did not tell his father, mother or the 911 operator that he recognized the shooter. Doe was being treated by emergency personnel when Los Angeles Sheriff's deputies arrived. An expended bullet was later found in the driveway of the church. The bullet was determined to be either a .38 special or .357 magnum caliber, most likely fired from a

revolver.  The bullet found at the scene was the same caliber as the one removed from Doe at the hospital.

The deputy testified that Doe was "vague" and seemed to move in and out of consciousness while at the scene of the crime.  He identified the shooter as a male Hispanic in a black car.  Doe was taken to Huntington Memorial Hospital, where his spleen and kidney were removed because they had been damaged by a bullet.  Doe also suffered a spinal cord injury from the shooting which caused paralysis from his pelvis to his feet.  Doe was placed on a ventilator and unable to speak from January 12 until January 14, 2008.  He communicated with the medical staff and his parents by writing notes.  In one note, he wrote, "I forgive them."  His first words upon removal of the ventilator were, "I forgive the person who did this to me . . . whoever did this to me . . ."  Doe did not identify the shooter to his parents, investigating detectives or visitors during the first few days of his stay at the hospital.

On January 17, Doe told detective Scott Schulze that he knew the shooter was Santana.  He  had known Santana since junior high school.  Although Santana was two years older, they attended the same gym class.  Doe also saw Santana at street fairs in Monrovia two or three times after junior high school.  Doe believed Santana was associated with Monrovia Varrio Nuevo (MNV) and that his gang moniker was "Tuffy."  School records at Santa Fe Middle School confirmed Doe's recollection that he attended school with Santana.  Doe then picked Santana's photograph out of a photographic six-pack.

Santana's home was searched on January 29, 2008.  In an upstairs bedroom, police found a laminated poem hanging on the wall:

> "Most streets are ruthless
> Walk down the wrong street you'll end up toothless.
> In L.A. don't step in their alley's
> Get cut up, that's how we do it in Cali.
>
> All the homies kick it in the park
> We vandalize the city when it's dark
> Trying to stay away from these sorry mark's

3

I'm to [*sic*] deep in the streets I have lot's [*sic*] of heart

Hearing gun shots by the hour
Hoping I don't end up in the twin towers
Enemies run from me they're all cowards
Because I'm the shot caller with lots of power

I said it before the streets aren't right
Look up and down no cops in sight
See my enemies let's start a fight
That's how it is for me every night.
-By Jimmy Santana"

Santana was arrested and during the booking process, he told Detective Schulze that he had been a member of MNV with the moniker of Little Tuffy but that he was no longer active. Santana's residence was three miles from the scene of the shooting.

Santana was charged with three felony counts: (1) attempted premeditated murder (Pen. Code §§ 664, 187 subd. (a))[1]; (2) shooting from a motor vehicle (§ 12034, subd. (c)); and (3) assault with a firearm (§ 245, subd. (a)(2)). The information also included firearm and gang enhancement allegations as to each of the three counts. (§§ 186.22, subds. (b)(1) – (4), 667.5, subd. (c)(8), 12022.5, 12022.53, subds. (b)-(e).) At the preliminary hearing, Doe identified Santana as the shooter. Although he had no doubts that Santana was the shooter, Doe admitted, "when I got shot, it was mostly a blind side. I looked—it was so quick when everything happened, like I heard—when I saw—I saw a little Hispanic out the window with a gun . . ." Detective Schulze testified that Doe had said friends told him that Santana was the shooter.

At trial in 2012, four years after the shooting, Doe described the shooting as presented above and again identified Santana as the shooter. He explained that he did not identify Santana at the scene of the crime because he was having trouble breathing and wanted to save his breath. Although the deputies asked him several times who shot him, Doe did not answer the deputies' questions because he was afraid he was going to die.

---

[1]    All further section references are to the Penal Code unless otherwise specified.

He also failed to identify the shooter at the hospital because he wanted to recover from his injuries. He waited until "[he] felt the time was right, when [he] actually had time to think to [him]self . . ." The prosecution also presented testimony from several gang experts regarding MNV, a Hispanic gang, and its feud with the Duroc Crips. Evidence was elicited showing Santana's involvement with MNV.

The defense presented testimony from an expert on eyewitness identification, who explained that various factors, such as stress, delay and cross-racial identification, could result in identifications that were less accurate. Santana's mother and brother also testified that Santana never left their home the day of the shooting.

Santana was found guilty of all three counts and the jury further found to be true each of the firearm and gang enhancement allegations. Santana was sentenced to 15 years to life in state prison for the attempted murder conviction and a consecutive 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). The sentences on the remaining counts and enhancements were stayed. Applicable fees and fines were imposed. Santana timely appealed.

## DISCUSSION

On appeal, Santana asserts the trial court committed error in admitting prejudicial and tainted evidence, limiting the defense expert's testimony and allowing testimony to be read to the jury outside of his presence. He also contends he should have been allowed to substitute in retained counsel prior to sentencing to evaluate the case for a new trial motion. None of these issues warrant reversal.

## I.     Doe's Identification Testimony Was Properly Admitted

Santana argues that reversal is required due to "the erroneous admission of John Doe's in-court identification [which] deprived appellant of due process of law." Santana contends that Detective Schulze's comments were improper and created a "substantial likelihood of misidentification." (*Neil v. Biggers* (1972) 409 U.S. 188, 202 (*Biggers*).) We disagree.

Prior to Doe's second day of testimony, defense counsel asked the court to exclude Doe's in-court identification of Santana on the ground it was tainted. The motion arose from a conversation Detective Scott Schulze had with Doe the previous day while he drove Doe to court. Detective Schulze was also the detective assigned to investigate Doe's shooting. As they spoke about what to expect in the courtroom, Detective Schulze told Doe, "They're going to ask you to identify the suspect in court. He may look different now. It's still the guy, or it's still the same guy." At lunch, this conversation was mentioned to the prosecutor and she reported it to defense counsel. Defense counsel recalled that the prosecutor also said Detective Schulze told Doe, "Don't worry about it. It will be the same person." The trial court allowed Doe and Detective Schulze to be questioned outside of the jury's presence pursuant to Evidence Code section 402. Detective Schulze denied telling Doe, "People change, but don't worry about it, he'll be in court." He testified that he wanted to explain to Doe the procedures of the court and that he would probably be asked to identify someone in court. Doe recalled that Detective Schulze told him, "When you're identifying him, just know that there may be some changes, like alteration in appearance." He confirmed that Detective Schulze did not influence his in-court identification of Santana.

The trial court denied the motion to exclude, agreeing with the prosecutor that any defects in the testimony went to its weight and not its admissibility. After the conclusion of the defense's case, the parties reached a stipulation about what Detective Schulze told Doe, quoted above. The trial court advised the jury of it and that the parties' recollection differed about whether Schulze also told Doe, "Don't worry."

In support of his contention, Santana relies on a series of decisions involving police-arranged identification procedures, *Foster v. California* (1969) 394 U.S. 440 (*Foster*), *Biggers, supra,* 409 U.S. 188 and *Manson v. Brathwaite* (1977) 432 U.S. 98 (*Brathwaite*). These cases are instructive on when due process requires suppression of an eyewitness identification tainted by police arrangement. The Supreme Court has held that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. (*Brathwaite*, at pp. 107, 109; *Biggers*,

6

at p. 198.)  Even then, however, suppression of the resulting identification is not the inevitable consequence.  (*Brathwaite*, at pp. 112-113; *Biggers*, at pp. 198-199.)  Instead, due process requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification."  (*Biggers,* at p. 202.)  Reliability of the eyewitness identification is the "linchpin" of that evaluation.  (*Brathwaite*, at p. 114.)  It is only where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion that the identification should be suppressed.  (*Id.* at p. 116.)  Otherwise, the identification, assuming no other barrier to its admission, should be submitted to the jury.  (*Ibid.*)  Among the factors to be considered are: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  (*Id*. at p. 114.)

Applying this "totality of the circumstances" approach, the United States Supreme Court held in *Biggers* that law enforcement's use of an unnecessarily suggestive showup did not require suppression of the victim's identification of her assailant.  (*Biggers, supra*, at pp. 199-200.)  The victim's identification was reliable: she saw her assailant for a considerable period of time under adequate light, provided police with a detailed description of her attacker long before the showup, and had "no doubt" that the defendant was the person she had seen.  (*Ibid.*)  Similarly, the court concluded in *Brathwaite* that police use of an unnecessarily suggestive photo array did not require exclusion of the resulting identification.  (*Brathwaite, supra*, at pp. 114-117.)  The witness, an undercover police officer, viewed the defendant in good light for several minutes, provided a thorough description of the suspect, and was certain of his identification.  (*Id.* at p. 115.)  Hence, the "indicators of [the witness'] ability to make an accurate identification [were] hardly outweighed by the corrupting effect of the challenged identification itself."  (*Id.* at p. 116.)

7

By contrast, in *Foster*, *supra,* 394 U.S. at p. 443,  the high court held that the suggestive elements in the identification procedure made it all but inevitable that the witness would identify the accused whether or not he was, in fact, "the man."  The court further found that the procedure so undermined the reliability of the identification as to violate due process.  The defendant, about six feet in height, was placed in the line-up with two other men, both six or seven inches shorter in height.  (*Id.* at p. 441.)  He wore a leather jacket similar to one the witness said he observed under the overalls worn by the robber.  When the witness could not identify the accused, he was brought into a room and seated across the table from the witness in a one-to-one show up.  Even then, the witness was uncertain as to whether the accused was one of the robbers.  Some seven to ten days later, the accused was again placed in a line-up of five men with neither of the shorter men in the previous line-up included.  It was not until this time that the witness made the positive identification.  (*Ibid.*)  Moreover, the police repeatedly said to the witness, "'*This* is the man.'"  (*Id.* at p. 443.)

Even assuming Detective Schulze's comment to Doe was unnecessarily suggestive, we find Doe's identification was reliable under the totality of the circumstances approach.  As in *Biggers* and *Brathwaite*, the evidence showed that Doe was certain of his identification at the hospital five days after the shooting, at the preliminary hearing a few months later, and at the trial four years later.  He confirmed at trial he was "one hundred percent" confident that Santana was the person who shot him.  He first identified Santana by name, described him and then picked him out of a photographic lineup.  Also, Doe was able to see Santana at arm's length while it was still daylight.  Although Santana's beanie was pulled over his forehead, partially obscuring his face, Doe was sufficiently familiar with his features to recognize him.

Santana contends that Doe's identification was not reliable for a number of reasons.  First, there were issues with Doe's ability to perceive the shooter:  it was nearing sunset, Doe was not wearing his glasses, the car was slightly behind and to Doe's left side or "blind side" and Santana was wearing a beanie pulled low over his forehead.  Second, Doe failed to identify Santana for five days, during which time, there was some

8

evidence that his friends may have influenced his identification. Third, Detective Schulze influenced Doe's identification during the photographic lineup by advising Doe that "there's one person in the picture that you're interested in and the other five have nothing to do with the case."

We are not convinced any of these circumstances renders Doe's identification so unreliable as to amount to a violation of due process. Instead, they are merely facts that go to the weight of the evidence, not its admissibility. Certainly, the jury was provided with extensive information about the identifications with which to make its own reliability determination. Defense counsel conducted an extensive cross-examination of Doe, eliciting testimony from him about whether he wore his glasses that day, what the lighting was like, how quickly everything happened and the reasons for his failure to identify Santana initially. Defense counsel also questioned Doe about his conversation with Detective Schulze. These issues were raised again in closing arguments. Therefore, the jury had before it a thorough record of why the identification might be untrustworthy.

"[E]vidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (*Brathwaite*, *supra*, at p. 116.) Santana's due process rights were not violated by the submission of the identification evidence, with all of defendant's caveats, to the jury.

## II. Gang Evidence Was Properly Admitted

Santana next contends he was prejudiced by the admission of irrelevant and cumulative gang evidence. In particular, Santana requested the exclusion of: the poem found in his home; the testimony from Monrovia Police Officer Sergio Bostick regarding his contacts with Santana; and his booking photos from August, 30, 2007 and January 2008. According to Santana, this gang evidence allowed the jury to infer he was a threat to the community and should be punished for being a bad person. Santana asserts the trial court erred under Evidence Code section 352 when it admitted this evidence. We disagree.

9

Evidence Code section 352 provides: "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Prejudice as used in Evidence Code section 352 refers to the harm of prejudging on the basis of extraneous factors. (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) It is not synonymous with damaging. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.) "'[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' [Citation.]" (*Id.* at p. 439.)

We find the trial court exercised its discretion appropriately in admitting the challenged evidence. The case against Santana involved gang-related offenses. The People were required to prove the underlying felony was committed: 1) for the benefit of, at the direction of, or in association with any criminal street gang, and 2) with the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1).) In addition, showing the jury that Santana associated with the MNV gang tended to establish motive and intent in the shooting. The People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518.) "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." (*People v. Lopez* (1969) 1 Cal.App.3d 78, 85; see also *People v. Martin* (1994) 23 Cal.App.4th 76, 81 [gang activity or membership admissible where "important to the motive . . . even if prejudicial"].) Each of the challenged pieces of evidence added probative value which was not outweighed by its prejudicial effect.

10

First, the poem was relevant to show Santana's familiarity with and commitment to gang culture. In particular, Santana showed a willingness to initiate violence with his "enemies." He referred to himself as a "shot caller with lots of power" whose "[e]nemies run from me . . ." He also wrote, "See my enemies let's start a fight." The poem tended to support the People's theory that Santana shot Doe as part of a vendetta against a rival gang.

Likewise, Bostick's testimony was properly admitted. At trial, Bostick testified that he encountered Santana with known MNV gang members several times at MNV hangouts in 2003 and 2004. Showing the jury that Santana associated with other documented members of the MNV gang was necessary to prove that Santana had a long history with the gang and belied his statement to Detective Schulze that he was no longer a member. Therefore, it had little potential for evoking an emotional bias against Santana or for causing the jury to convict him apart from the evidence of his guilt. That it may have been cumulative to other gang evidence does not render it so prejudicial as to warrant exclusion. (*See People v. Scheid* (1997) 16 Cal.4th 1, 16 ["it is immaterial for purposes of determining the relevance of evidence that other evidence may establish the same point"].)

Neither are we convinced that the admission of Santana's booking photographs should have been excluded under Evidence Code section 352. These photographs related to a January 26, 2008 traffic stop, an August 3, 2007 police contact and the January 29, 2008 arrest. When questioned about the necessity of having three photographs of Santana admitted, the prosecutor explained that the January 26 and January 29 photographs showed what Santana looked like "as close to the shooting date as possible." Also, the 2007 photograph was the one used for the photographic six-pack. At closing, the prosecutor told the jury that the January 29 photograph showed that Does' description of Santana "as having a triangle patch of hair on his chin and a slight mustache" was "absolutely correct." The prosecutor further explained that even though Santana looked different in the photograph from 2007, Doe was able to pick him out when it was presented to him in the photographic array. These photographs tended to support Doe's

11

identification of Santana. They had a legitimate purpose at trial and did not, as asserted by Santana, serve only to "inflame[] the jury's passions".

We are also not convinced that the photographs were improper character evidence under Evidence Code section 1101(a). Evidence Code section 1101, subdivision (a), provides that "evidence of a person's character"—whether in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct—"is inadmissible when offered to prove [the person's] conduct on a specified occasion." This prohibition, however, does not preclude "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than [the person's] disposition to commit such an act," including "motive, opportunity, intent, preparation, [or] plan." (Evid. Code, § 1101, subd. (b).) As discussed above, the challenged evidence was relevant to motive and intent as well as the weight of Doe's identification. Accordingly, it was not precluded under Evidence Code section 1101. Compared to their probative value, the challenged evidence was not so prejudicial as to warrant exclusion. The trial court acted within its discretion in admitting the evidence.

## III. Defense Expert's Testimony Was Not Limited

Santana next argues that he was deprived of his right to present a full defense when the trial court limited the testimony of his eyewitness identification expert. Santana contends the trial court limited the defense to generalized questions "untethered" to the facts of the case when it sustained the prosecutor's objection to a hypothetical. The record disproves Santana's characterization of the proceedings.

Prior to trial, the People moved to exclude or limit testimony from the defense eyewitness expert on the ground that this case involved a victim who knew the defendant before the shooting and was not the typical identification of a stranger. The motion in limine was denied. However, the trial court ruled that "[c]ertainly he can talk about cross-racial identification, but he should not be allowed to offer an opinion as to the eyewitness in this case as being unreliable since we have an African-American victim and the defendant who is Hispanic."

12

During examination of the defense expert, counsel asked, "You had mentioned earlier the idea of suggestibility. Hypothetically, if an investigating officer is transporting—" The People objected and at a conference at sidebar, the following colloquy occurred:

"[Prosecutor]: Your honor, I think we've agreed that he's not to make an accuracy determination of an identification in this case, and that's why counsel keeps raising these hypotheticals.

[Defense Counsel]: I'm talking about suggestibility. The facts are that the investigating officer, as well as you, will be testifying to the fact that this officer told a witness on the way to court that the person would be there. I want to know, does that impact the identification.

The Court: Or could it.

[Prosecutor]: But, your honor, if he's allowed to put those facts in evidence, he's testifying to the accuracy of the identification in this case. He has no idea about anything in this case. So if he wants to talk about suggestibility, that's fine.

[Defense Counsel]: I have to give him a hypothetical. The hypothetical has to be–

[Prosecutor]: I disagree.

The Court: You can ask him if—could that have an impact.

[Defense Counsel]: Certainly.

The Court: Then we'll go from there."

The record shows that the trial court did not sustain the People's objection with regard to the hypothetical involving suggestibility. Indeed, the record shows that defense counsel was permitted to ask hypothetical questions relating to the facts of the case. There was no error.

IV.  **No Prejudice Resulted From Santana's Absence at the Readback**

Santana further argues that he was deprived of his right to be personally present at trial when testimony was read back to the jury. The jury requested readbacks of "John Doe's testimony re: minutes prior to shooting" and "People's 25, testimony from Detective Shulze describing the six pack." The court reporter read back the relevant

portions of the transcript with all jurors, both counsel, the reporter and the courtroom deputy present. Santana was not present and it does not appear he waived his right to be present at the readback. He contends that the trial court violated sections 977[2] and 1043,[3] article I, section 15 of the California Constitution and the Sixth and Fourteenth Amendments to the federal Constitution.

There is no federal or state constitutional violation when a readback occurs in a defendant's absence and without a waiver. (*People v. Cox* (2003) 30 Cal.4th 916, 963; *People v. Ayala* (2000) 23 Cal.4th 225, 288.) Instead, a defendant's right to be present during a readback is based on statute, sections 977 and 1043 in particular. Thus, any error "'is reversible only if it is reasonably probable the result would have been more favorable to defendant absent the error.' [Citation.]" (*People v. Moon* (2005) 37 Cal.4th 1, 21.) Nothing in the record indicates that Santana's presence would have assisted the defense. Though Santana asserts that he could have "assured that cross-examination had been read as well as direct examination," that the readback was "accurate" and helped create a "clear" record, there is no indication the readback was tainted in any way. Indeed, defense counsel was present at the readback and made no objection. The implication that the readback was not accurate or clear is entirely speculative. Because Santana provides no basis on which we could conclude the result of his trial would have been different had he been present at the readback (*see People v. Horton* (1995) 11 Cal.4th 1068, 1121), we find the violation of section 977 was harmless.

---

[2]  "In all cases in which a felony is charged, the accused shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present, as provided by paragraph (2)." (§ 977, subd. (b)(1).)

[3]  With exceptions not applicable here, section 1043, subdivision (a) provides that "the defendant in a felony case shall be personally present at the trial."

## V.  Cumulative Effect

Santana argues that the various alleged errors described above, considered individually or in combination, were prejudicial.  We have already rejected most of these claims on the merits.  We also conclude that any errors, considered together, did not substantially prejudice defendant or preclude a fair trial.  We see no basis for reversal.

## VI.  Attorney Substitution

Santana next contends he was denied his Sixth Amendment right to counsel of choice when the trial court denied his motion to substitute in retained counsel prior to sentencing.  We disagree.

After the verdicts were returned on February 2, 2012, defense counsel moved to void the jury's verdict under section 1118.1.[4]  The trial court tentatively denied the motion and set sentencing and post-trial motions to be heard on March 15, 2012, Santana filed a *Marsden*[5] motion on March 15, 2012, and sought to discharge his deputy public defender.  That motion was heard and denied.  After several continuances, the hearing on sentencing and other post-trial motions was set for May 10, 2012.

A motion for substitution of retained counsel was filed on May 8, 2012, and the trial court heard arguments on it on May 10, 2012.  The trial court explained that "based on my observations of Mr. Lewis [the public defender], that he gave a full, rigorous, passionate defense of Mr. Santana.  And at this juncture, I cannot imagine what allowing a substitution would do other than allow Mr. Santana to remain in local custody as opposed to going to state prison as is required.  [¶]  And my tentative does not cast any

---

[4]    "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal.  If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right." (§ 1118.1.)

[5]    *People v. Marsden* (1970) 2 Cal.3d 118.

15

aspersions on your selection of Mr. Kilts as your attorney. I have known him for a number of years and believe he, as Mr. Lewis, is an excellent attorney. But I don't know what would be achieved other than having him remain in local housing."

Kilts explained that Santana had a right to representation of his own counsel at every stage. His substitution was for the purpose of reviewing the case with "fresh eyes" to see if there were any grounds for a motion for a new trial. If he concluded there were none, they would proceed with sentencing. After further argument by Kilts, the trial court denied the substitution request and stated, "there doesn't seem to be any reason to allow the substitution." Only after the denial of the motion to substitute retained counsel did the public defender request a brief continuance. The sentencing hearing was then continued to June 4, 2012, to allow Lewis and Santana's family to prepare their statements.

"The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing. [Citations.]' (*People v. Holland* (1978) 23 Cal.3d 77, 86, overruled on other grounds by *People v. Mendez* (1999) 19 Cal.4th 1084, 1098-1099.) Underlying this right is the premise that 'chosen representation is the preferred representation. Defendant's confidence in his lawyer is vital to his defense. His right to decide for himself who best can conduct the case must be respected wherever feasible.' (*Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 615, fn. omitted.)" (*People v. Courts* (1985) 37 Cal.3d 784, 789 (*Courts*).) "[T]he right of a defendant to appear and defend with retained counsel of his own choice is not absolute." (*People v. Blake* (1980) 105 Cal.App.3d 619, 624 (*Blake*).) "The right to such counsel 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.' [Citation.]" (*Courts, supra*, 37 Cal.3d at p. 790.)

Furthermore, "a defendant who desires to retain his own counsel is required to act with diligence and may not demand a continuance if he is unjustifiably dilatory or if he arbitrarily desires to substitute counsel at the time of the trial." (*Blake, supra*, at pp. 619, 623-624.) "It is likewise settled that it is within the sound discretion of the trial court to

16

determine whether a defendant shall be granted a continuance to obtain a private counsel [citation]; that there is no mechanical test for deciding whether a denial of a continuance is so arbitrary as to violate due process but rather each case must be decided on its own facts [citations]; that the burden is on the defendant to establish an abuse of discretion; and that in the absence of showing an abuse, the reviewing court will not disturb the ruling of the trial court.  [Citation.]"  (*Blake, supra*, 105 Cal.App.3d at p. 624.)

In *People v. Munoz* (2006) 138 Cal.App.4th 860, 869 (*Munoz*), the appellate court determined the trial court abused its discretion in denying a request to substitute retained counsel before a sentencing hearing.  The case is instructive,  but only because the facts there were different from this case.  The defendant in *Munoz* wrote a letter to the judge over a week before his scheduled sentencing hearing, indicating his desire to discharge his retained attorney and asking for the court to appoint a new attorney for him specifically so he could file a motion for new trial.  (*Id.* at p. 864.)  The court discussed the matter with the defendant and his retained lawyer at the scheduled hearing, then trailed the matter several days, and allowed the defendant to submit additional materials detailing his concerns about his lawyer.  The defendant submitted an additional six-page letter outlining his concerns.  (*Id*. at pp. 864-865.)  However, at the next hearing, the court denied the substitution request, essentially incorrectly relying on the need for a *Marsden* showing of incompetence, but then continued the sentencing hearing another month on the court's own motion to allow defendant to solicit supporting letters from family and friends to be considered for sentencing.  (*Munoz*, *supra*, at p. 865.)

The *Munoz* court found the record did not support a finding that substitution of counsel would have caused an unreasonable delay in the proceedings, given that the court delayed the proceedings over a month, during which time arguably a substituted attorney could have been appointed and become sufficiently familiar with the case. *Munoz* also cited the trial court's improper reliance on a *Marsden* standard in denying the request, as well as the defendant's detailed explanation of his concerns with his retained lawyer negating any concerns the request was sought solely for delay.  (*Munoz, supra*, 138 Cal.App.4th at p. 870.)  Most significantly, *Munoz* explained, "Most trials will not be

17

easily reviewed . . . , so delay and public expense will often be the primary reasons for denying motions to replace counsel post trial. The defendant must always be required to justify this additional expense to the satisfaction of the trial court, . . . Delay and public expense will militate for denial and we do not envision either a spate of such motions or a plethora of successful ones." (*Id*. at p. 868.)

After reviewing the record in light of the foregoing principles, we conclude that the trial court did not commit reversible error by denying Santana's request to substitute retained counsel. Santana appeared unsatisfied with appointed counsel as early as March 15, 2012, when he made a *Marsden* motion, requesting that his court appointed counsel be replaced with another court appointed counsel. Yet, when sentencing was continued to April 26, 2012, Santana made no request to retain private counsel at that time. In fact, it was not until three months after the verdicts were returned, and two months after the *Marsden* motion was made that Santana finally made a motion to substitute counsel.

At that time, Kilts had not even looked at the transcripts of trial, and, indeed, had no familiarity with the case. He gave no reason supporting his request to be substituted in except that another set of eyes might be helpful. He had no idea whether or not he would even file a motion for new trial. A substantial continuance would have been necessary to ensure Kilts had sufficient time to review the trial transcripts and research any potential issues before determining if a new trial motion was warranted. This was not an easy case to review, as was the situation in *Munoz*. Here, there was a lengthy trial with complex legal and gang issues, complicated eyewitness identification, and extensive expert testimony.

The court's reference to the fact that defense counsel had done a good job at trial does not indicate the court was improperly using a *Marsden* standard, but rather reflects the court's observation that counsel had performed competently at trial and was present and capable to properly handle the sentencing hearing. In addition, the trial court was unaware there was a need for a continuance to allow the parties to gather letters of support until after it had denied the substitution motion. Because we do not expect trial judges to be prescient, that was not a factor it was required to take into consideration.

18

Under these circumstances, we do not believe the trial court acted so arbitrarily as to violate defendant's constitutional rights in denying his request to substitute retained counsel. Defendant's request was "unjustifiably dilatory" (*Blake, supra*, 105 Cal.App.3d at pp. 623-624) and the trial court properly weighed defendant's right to counsel of his choice "'against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration.'" (*Courts, supra*, 37 Cal.3d at p. 790.)

We believe the record here adequately supports the court's exercise of discretion. We cannot conclude the refusal to grant the substitution, as well as the continuance that would have been required, amounted to an abuse of discretion. (*People v. Turner* (1992) 7 Cal.App.4th 913, 919, fn. 8 [rejecting assertion that trial court failed to make a finding that substitution would have disrupted the judicial process because it was "perfectly obvious" a substitution granted on the day of trial would mandate a continuance].)

## DISPOSITION

The judgment is affirmed.

BIGELOW, P. J.

We concur:

FLIER, J.

GRIMES, J.