Filed 8/25/16  P. v. Xiao CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C077168 |
| v. | (Super. Ct. No. 13F07060) |
| QINGNING XIAO et al., | |
| Defendants and Appellants. | |

This case involves a married couple, defendants Qingning Xiao (wife) and Minghai Ye (husband), who stole electricity from the local utility company to engage in commercial marijuana cultivation in a residential neighborhood.  A jury convicted defendants of theft of utility services totaling more than $950 (Pen. Code, § 498, subd. (d)) and possession of marijuana for sale (Health and Saf. Code, § 11359).  The trial court sentenced Xiao and Ye to serve two years and eight months in prison but suspended execution of sentence for a term of five years during which defendants would be granted formal probation and serve one year in county jail.

1

Xiao and Ye separately appeal but do not join in each other's arguments. However, both argue they were denied their constitutional rights to conflict-free legal representation. Xiao also argues the trial court erred in refusing to instruct the jury a mistake of law was a defense. And Ye argues the evidence was insufficient as a matter of law to impose an order to pay $8,746.95 in restitution to the utility company.

We conclude Xiao and Ye knowingly and voluntarily waived their rights to conflict-free legal counsel after the trial court repeatedly cautioned defendants about the risks of joint legal representation. Xiao's argument regarding instructional error is forfeited for failure to include any citation to the appellate record. And Ye's argument concerning the restitution order is forfeited for lack of any legal authority in support. Accordingly, we affirm the judgments.

FACTUAL AND PROCEDURAL HISTORY

***Prosecution Evidence***

On October 29, 2013, Sacramento County Sheriff's Deputy Michelle Allen responded to an e-mail complaint about a possible commercial marijuana growing operation in a residential neighborhood at 7400 Center Parkway in Sacramento. When Deputy Allen drove her marked patrol car to the address, a man later identified as Ye quickly went inside the house. Deputy Allen knocked on the front door, where there was a strong smell of marijuana. Ye answered the door and Xiao soon came up behind him. Upon being asked, both Ye and Xiao confirmed they were growing marijuana inside the house. Deputy Allen chatted with them for "quite a while at the door" and found both Ye and Xiao spoke "pretty good English." Deputy Allen had no difficulty understanding them.

Deputy Allen explained to Ye and Xiao that she was going to do a compliance check and asked defendants for their medical marijuana recommendation letters. Xiao

2

retrieved the letters for Ye and herself. Xiao's letter was dated October 3, 2013, and stated it authorized her to grow up to 99 marijuana plants. Ye's was dated October 29, 2013, and also stated it authorized possession of up to 99 marijuana plants.

Inside the house, Deputy Allen saw a total of 828 marijuana plants being grown in four rooms. Deputy Allen called the sheriff's department narcotics unit and a search warrant was obtained. The subsequent search revealed the house appeared to be uninhabited except for the marijuana growing operation. There was no bedding, no food, and no personal items in the bathroom. The bathroom was being used as a chemical watering station, and the bathtub was filled with marijuana-growing equipment. There were indoor grow lights, large fans, electrical ballasts, energy boxes, electrical cords, and timers. There was no paraphernalia to indicate marijuana was being consumed inside the house.

Over the course of an hour, Deputy Allen took Ye's statement. Deputy Allen did not have trouble understanding him in English, testifying that "it wasn't easy, but we were able to communicate." Ye told her that in July or August 2013, he purchased the house on Center Parkway and another house on West Taron Drive in Elk Grove. Then, on September 24, 2013, he moved from Ohio because he had been told it was legal to cultivate marijuana in California. He purchased the homes by using proceeds from the sale of a Chinese restaurant in Ohio. Ye denied ever going inside the house. Instead, Ye stated he had rented the house to a Chinese man he met at a hydroponics store. The Chinese man told Ye the police could not bother Ye if he got a medical marijuana recommendation. Ye did not settle on a specific amount of rent and had not received any money from the Chinese man. Ye also told Sacramento County Sheriff's Deputy Cambron Beeson he smoked marijuana, put it into his food, and made tea with it -- using

3

approximately a half ounce per day. Deputy Beeson went over Ye's statement with him four or five times to ensure its accuracy.

A search of Xiao's wallet yielded several items including: $1,731 in cash; a transaction receipt from East West Bank showing a deposit had been made earlier that day in the amount of $110,000; and a credit card receipt for utility shears, a drill, saws, and a four-gallon backpack sprayer.

Parked in the driveway, sheriff's deputies found a 2010 Mercedes Benz C300 sedan with Ohio license plates that was registered in Ye's name. From the car, deputies retrieved a list of local marijuana dispensaries, business cards for a hydroponics store, and bills and receipts from the Sacramento Municipal Utility District (SMUD). Two of the SMUD bills were addressed to Jian Yu and billed for service at the Center Parkway residence for the period from August 24, 2013 through October 2, 2013. The first bill indicated the utility service had begun on August 24, 2013. Receipts for payment of these utility bills were also found in Ye's Mercedes.

Robert Duggan, a power theft investigator for SMUD, testified an average marijuana grow house can draw 8,000 to 10,000 kilowatt hours per month with a value of more than $1,000. Duggan found an unauthorized electrical bypass at the Center Parkway residence. The underground riser had been cut and the service wires were clamped to divert power from going through the electric meter. Duggan went through the house and determined which equipment was drawing from the unmetered electrical bypass. He totaled the power drawn by the equipment and used a computer to calculate the kilowatts used per day. Based on the total kilowatts, Duggan determined SMUD lost $8,746.95 in service costs from August 6, 2013 through October 29, 2013. Duggan noted utility service was started under the name of Jian Yu on August 6, 2013, and changed over to Ye on October 1, 2013.

4

Sheriff's deputies also searched the Taron Drive residence. No marijuana or supplies related to marijuana cultivation were found at the Taron Drive residence. Deputies found mail labels for Xiao and Ye that bore the Center Parkway address. There were also water bills for the Center Parkway residence. One of the utility bills for the Center Parkway address was addressed to Xiao. In the closet of the master bedroom, deputies found $10,000 in cash. However, deputies did not find any lease agreement for the Center Parkway address.

On October 30, 2013, Folsom Police Department Detective Louis Wright acted on a search warrant to open a safe deposit box belonging to Xiao and Ye at East West Bank. Inside, Detective Wright found two envelopes containing a total of $20,000 in cash. He also retrieved $26,394 from a bank account at JP Morgan Chase Bank and $121,632 from an account at East West Bank. Detective Wright testified it was common for persons involved in marijuana sales to have large sums of cash and make real estate purchases to avoid detection. The 828 marijuana plants at the Center Parkway residence had an estimated total value of $310,500 at maturity. A typical marijuana grow for personal medical use would consist of only six to nine plants. Detective Wright testified the Center Parkway residence was used for a commercial marijuana grow and he believed the $121,632 in the East West Bank account came from marijuana sales.

### Defense Evidence

Through a Mandarin language interpreter, Xiao testified on behalf of the defense as follows: She was born in China and immigrated to the United States, eventually settling in Ohio. In Ohio, she and Ye operated a Chinese restaurant and acquired three houses. She traveled to California in June 2013 to purchase houses as an investment. She and Ye bought two houses in Sacramento, intending to live in the one on Taron Drive and rent out the one on Center Parkway. Xiao and Ye sold their property in Ohio

5

and moved to California. Xiao denied moving to California in order to cultivate marijuana.

Xiao stated she rented the Center Parkway residence to Feng Fueai, whom she met in June 2013 at a local farmers' market while looking for a bathroom. At trial, Xiao could not recall what Feng looked like. Feng gave Xiao a $2,000 deposit, and Xiao handed over the keys to the residence on July 27, 2013. Feng did not inform Xiao she intended to grow marijuana inside the residence. Xiao returned to Ohio. Xiao gave her a lease to sign, and Feng returned it when Xiao and Ye arrived in California from Ohio.

On September 30, 2013, Xiao and Ye visited the Center Parkway residence and were "hurt" when they saw all the marijuana growing and the related holes in the walls. Feng stated she was growing the marijuana for her livelihood, and Xiao told her to move out. Feng showed Xiao her medical marijuana recommendation and stated the grow was legal. Xiao had sympathy for Feng's plight as a widow and decided not to call the police. Xiao also did not know enough English to talk with the police. Feng was still living at the Center Parkway residence on October 29, 2013, but Xiao did not know why Feng was not there when the police arrived.

Xiao denied she and Ye were growing marijuana and stated she never saw Ye working on the marijuana grow. Xiao never used marijuana and denied ever seeing Ye ingest marijuana. Xiao first testified she had not known marijuana was illegal to grow, but later testified she was worried because she knew the marijuana being grown at Center Parkway was illegal. Xiao stated Feng told her marijuana was legal with a recommendation letter and took Xiao to hydroponics stores and places where they sold marijuana. Xiao later testified she only went to hydroponics stores because Feng "wouldn't have taken [her] to all those places where those people made all those

6

purchases." Feng took Xiao and Ye to get medical marijuana recommendation letters so they could go in and out of the Center Parkway house. Although Xiao and Ye did exterior landscaping, they did not tend any of the marijuana plants.

Xiao testified she was unable to understand Deputy Allen on October 29, 2013. She did not know what questions she was answering when the sheriff's deputies asked her about marijuana. The police did not bring a Chinese language interpreter to the Center Parkway house.

As to the money in the bank accounts, Xiao explained she and Ye had sold their restaurant and property in Ohio, and her family in China had sent them money as well. None of the money seized by the police had come from marijuana sales.

Xiao acknowledged that if a receipt were found in her purse, it belonged to her. However, she could not recall purchasing a sprayer backpack.

When shown a copy of the lease for the Center Parkway residence, Xiao stated the name on the lease had been altered in handwriting that did not belong to her. Xiao could not explain how the police searched the closet in which the lease was stored but did not find it. Xiao denied knowing anyone named Jian Yu.

### Rebuttal Testimony

On rebuttal, the prosecution introduced the testimony of Dr. Robert Ferrera. Dr. Ferrera testified he does medical marijuana evaluations for a living. His nurse practitioner evaluated Xiao on October 1, 2013. Through an interpreter, Xiao stated she had chronic lower back and neck pain. Dr. Ferrera evaluated Ye on October 29, 2013, when he complained of upper and lower back pain. On his evaluation form, Dr. Ferrera did not check the interpreter box -- meaning the patient understands English sufficiently well to communicate. Xiao and Ye received the same recommendation: that they could grow up to 99 marijuana plants and possess 16 pounds of processed marijuana. When

7

making his recommendations, Dr. Ferrera had not realized Xiao and Ye are married. He did not think it was reasonably necessary for either Xiao or Ye to possess 828 marijuana plants. Dr. Ferrera conceded he did not know whether the interpreter translated Xiao's statements truthfully or accurately.

DISCUSSION

I

*Right to Conflict-free Legal Representation*

Ye contends the trial court "failed to conduct an adequate inquiry as to the validity of the purported waiver by ascertaining that any 'waiver' was made knowingly and intelligently." Ye and Xiao argue the trial court should have appointed independent counsel to explain the risks of joint legal representation. Ye and Xiao also argue their written waivers of the right to conflict-free counsel were invalid for lack of evidence the waivers had been translated into the Mandarin language. The arguments lack merit.

**A.**

*Trial Court Admonishments*

On July 9, 2014, the trial court addressed the issue of a potential conflict in joint legal representation before jury voir dire began. In open court, with a Mandarin language interpreter present, the trial court noted Xiao and Ye had already filed written waivers in the form of declarations. In pertinent part, Xiao's declaration stated:

"I understand that the following conflict of interest may exist with my counsel: My Husband and Codefendant Minghai Ye and I are both charged with the same crimes. These allegations stem from a search warrant issued by the Sacramento Superior Court and executed on 29th of October 2013 at 7400 Center Parkway in Sacramento, CA and 9904 W Taron Drive in Elk Grove. It has been explained to me that since the both of us

8

are charged for the same crimes that a potential conflict may exist in our joint defense." (Italics omitted.) The declaration acknowledged she had discussed the potential conflict and potential drawbacks of joint representation with her attorney who had advised seeking outside counsel for further consultation. She further acknowledged "the dangers and possible consequences of conflicted representations," but knowingly and voluntarily waived the right to representation by an attorney free from any conflict of interest. Xiao signed the declaration under penalty of perjury.

Ye signed a declaration identical in all respects, except it referred to Xiao as his codefendant. As did Xiao, Ye signed under penalty of perjury.

Even with written declarations, the trial court stated: "I just want to revisit the issue I guess as belt and suspenders to make sure that the record is clear as possible since I have not taken a waiver on this. [¶] [Defendant] Ye, [defendant] Xiao, you have the right to be represented by an attorney who has no conflict of interest, an attorney who would represent you with undivided loyalty. [¶] [Attorney] Karalesh is representing both of you in this case, all right, and I want to make sure that you understand there are some risks with having one attorney represent two defendants. When one attorney represents both defendants, then the decisions and the tactics made may not always be in the best interest of one client or the other. The joint representation of co-defendants may compromise the attorney's duty of loyalty to each defendant individually. [¶] Do you understand what I am addressing here?"

In response, Ye and Xiao both nodded they had understood.

The trial court continued by inquiring whether either defendant had any experience with court proceedings. After both defendants shook their heads, the trial court decided to "start with some basics" and invited the defendants to stop him and ask questions about anything they did not understand. The trial court noted that "it's all

9

being translated for you," and proceeded to explain each defendant had a right to legal representation by an attorney with an undivided duty of loyalty and any attorney representing both of them might have a conflict. The trial court further explained either defendant could hire the attorney of his or her choice. The decision to retain joint counsel presented potential problems of inconsistent defenses and different positions on plea negotiations. The trial court also noted one defendant might have been more culpable than the other. And the trial court cautioned the statements of one defendant might harm the interest of the other defendant. Both Ye and Xiao nodded their heads to indicate they understood the admonishments.

The trial court reiterated a single attorney might not be able to represent them as effectively as separate counsel. Reminding them of their previously signed waivers, the trial court individually inquired of Ye and Xiao whether they had discussed the risks of joint representation with their attorney. Ye responded, "Yes, I understand." Xiao responded, "I don't know what to say because at that time I just thought that it's the same case, and as we[']re a husband and wife couple, to be represented by one attorney is what is best, is what my understanding was."

The trial court followed up by explaining again that Xiao had the right to separate counsel, to the appointment of counsel if she could not afford an attorney, and she had the right to hire the attorney of her choice. The trial court reiterated the cautions that codefendants may have differing interests in plea negotiations, in the evidence presented, varying levels of involvement or responsibility, and have made statements implicating the other defendant. Xiao responded, "I would like to have the same attorney representing both of us." She further stated she had discussed conflict of representation issues with defense counsel.

10

In response to the court's repeated inquiry about whether she understood the potential consequences of joint representation, Xiao stated: "I don't quite really understand the ins and outs of this, but I still would like to have the same attorney representing both of us because I think I have total trust in him."

Defense counsel then stated it might be best if he spoke with Ye and Xiao outside the courtroom to discuss again the issues of joint representation. The trial court stated that "would certainly be fine" and inquired whether "it would be helpful to have a panel attorney talk to one or the other independently briefly?" The trial court informed both defendants separate counsel could be made available to talk to either of them. Xiao stated, "I don't want to talk to the other attorney."

The trial court indicated to defense counsel that "you can have the interpreter available if that will facilitate your discussions." Defense counsel indicated it would be helpful.

After a brief recess, Xiao indicated she had spoken with defense counsel. She also acknowledged she had "discussed with him the dangers and possible consequences and disadvantages as to joint representation . . . ." Ye also answered he had discussed the same with their attorney. The trial court then took their waivers of conflict-free counsel. The trial court stated on the record it found the waivers to be knowing, intelligent, and voluntary. Neither Ye nor Xiao indicated they had any questions on the topic before the trial court moved on.

### B.

### *Right to Conflict-free Legal Counsel*

Under both the United States and California Constitutions, a criminal defendant has the right to effective representation by legal counsel. (U.S. Const., Amend. 6; Cal. Const. art. I, § 15; *People v. Bonin* (1989) 47 Cal.3d 808, 833-934 (*Bonin*).) "Where

11

a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." (*Wood v. Georgia* (1981) 450 U.S. 261, 271 [67 L.Ed.2d 220].) Moreover, "the constitutional guaranty protects the defendant who retains his [or her] own counsel to the same degree and in the same manner as it protects the defendant for whom counsel is appointed, and recognizes no distinction between the two." (*Bonin*, at p. 834.) Thus, "[w]hen the trial court knows, or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel, it is required to make inquiry into the matter." (*Id.* at p. 836.)

The California Supreme Court in *Bonin*, *supra*, 47 Cal.3d 808 further explained, "After the trial court has fulfilled its obligation to inquire into the possibility of a conflict of interest and to act in response to what its inquiry discovers, the defendant may choose the course he [or she] wishes to take. If the court has found that a conflict of interest is at least possible, the defendant may, of course, decline or discharge conflicted counsel. But he [or she] may also choose not to do so: 'a defendant may waive his [or her] right to the assistance of an attorney unhindered by a conflict of interests.' (*Holloway v. Arkansas* [(1978)] 435 U.S. [475,] 483, fn. 5; accord, *Glasser v. United States* [(1942)] 315 U.S. [60,] 70.)

"To be valid, however, 'waivers of constitutional rights must, of course, be "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences[,]" . . . [and] must be unambiguous and "without strings." ' (*People v. Mroczko* [(1983)] 35 Cal.3d [86,]110, quoting *Brady v. United States* (1970) 397 U.S. 742, 748, and *United States v. Dolan* (3d Cir.1978) 570 F.2d 1177, 1181, fn. 7.)

12

"Before it accepts a waiver offered by a defendant, the trial court need not undertake any 'particular form of inquiry . . . , but, at a minimum, . . . must assure itself that (1) the defendant has discussed the potential drawbacks of [potentially conflicted] representation with his [or her] attorney, or if he [or she] wishes, outside counsel, (2) that he [or she] has been made aware of the dangers and possible consequences of [such] representation in his [or her] case, (3) that he [or she] knows of his [or her] right to conflict-free representation, and (4) that he [or she] voluntarily wishes to waive that right.' (*People v. Mroczko, supra*, 35 Cal.3d at p. 110; see *Glasser v. United States, supra*, 315 U.S. at p. 71, 62 S.Ct. at p. 465 [to similar effect].)" (*Bonin*, *supra*, 47 Cal.3d at p. 837.)

"In determining whether a defendant understands the nature of a possible conflict of interest with counsel, a trial court need not separately explore each foreseeable conflict and consequence. Nor does a defendant's waiver of conflict-free counsel extend only to matters discussed in detail on the record. As [the California Supreme Court] observed in *Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 621, 'Rules that are that strict seem neither necessary nor workable.' " (*People v. Jones* (1991) 53 Cal.3d 1115, 1137.)

We review the trial court's ruling on a waiver of the right to conflict-free counsel under the abuse of discretion standard. (*People v. Baylis* (2006) 139 Cal.App.4th 1054, 1067.)

## C.

### *Ye's Argument Regarding the Trial Court's Inquiry*

Ye contends the trial court did not adequately ensure the waivers of conflict-free legal counsel were knowing and voluntary. We conclude the trial court did not abuse its discretion in finding both Ye and Xiao knowingly, intelligently, and voluntarily waived their rights to conflict-free counsel.

13

Even if Ye and Xiao were able to communicate effectively only in Mandarin, the record establishes they had the assistance of a Mandarin language interpreter during the trial court's inquiry regarding their understanding of the potential risks of joint legal representation. The trial court admonished Ye and Xiao about the risks of joint legal representation at least six separate times. Specifically, the trial court repeatedly explained Ye and Xiao each had the right to separate and conflict-free counsel and joint legal representation carried risks of inconsistent defenses, varying levels of culpability, differing interests in plea negotiations, and trial tactics that might benefit one of them to the detriment of the other. Ye and Xiao indicated they understood the risks and wanted to continue with joint legal representation. The trial court also several times invited questions from Ye and Xiao about the issue of conflict-free representation and made it clear they needed to understand their rights before waiving them. In every response, Ye and Xiao indicated they wanted joint legal representation.

Even though Xiao unequivocally stated, "I still would like to have the same attorney representing both of us because I think I have total trust in him," the trial court took additional precautions based on her statement that she did not understand "the ins and outs of this." Thus, the trial court expressly offered Ye and Xiao the opportunity to speak with independent counsel. Neither Ye nor Xiao expressed any interest in speaking with independent counsel. Xiao flatly refused. The trial court also took a recess in order to allow Ye, Xiao, their attorney, and the Mandarin language interpreter to further discuss the issue of conflict-free counsel.

After the recess, the trial court questioned Ye and Xiao to ensure they still wanted joint legal representation, understood joint legal representation posed problems of divided loyalty, knew they had the right to conflict-free counsel, and voluntarily waived the right to separate counsel. Both Ye and Xiao answered affirmatively to each of these questions

14

by the trial court. Defendants' trial attorney stated he was satisfied their waivers were knowing, intelligent, and voluntary. After this extended colloquy, the trial court accepted Ye and Xiao's waivers of conflict-free legal counsel.

Rather than demonstrating ineffective waivers, the thorough and careful treatment of the issue by the trial court made it clear Ye and Xiao understood the risks of joint legal representation, their opportunity to speak with independent counsel, they had the right to separate counsel, and they knowingly and voluntarily chose to have one attorney represent both of them. The assistance of the Mandarin interpreter both in open court and during the recess with their trial attorney ensured language was no barrier to their understanding of the proceedings and repeated trial court admonishments. Consequently, the trial court acted within its discretion to accept Ye and Xiao's waiver of conflict-free legal representation.

### D.

### *Ye and Xiao's Arguments that the Trial Court Should Have Appointed Independent Counsel*

Xiao contends, "the trial judge should have appointed independent counsel to explain the conflict or otherwise refused to allow a waiver of conflict-free representation." Similarly, Ye argues, "the trial court should have appointed separate counsel to independently advise Minghai Ye." In effect, Xiao and Ye argue the trial court should have ignored their rejections of the opportunity to speak with independent counsel even though Xiao stated she did "not want to talk to the other attorney" and Ye declined the option even though he understood it. We are not persuaded.

In their arguments, Xiao and Ye rely on *Alcocer v. Superior Court* (1988) 206 Cal.App.3d 951 (*Alcocer*). *Alcocer*, however, does not support their arguments. In *Alcocer*, the trial court granted the People's motion to recuse a criminal defendant's

15

retained attorney for having a conflict. (*Id.* at p. 955.) The conflict involved the retained attorney's simultaneous representation of (1) a criminal defendant (Alcocer) who was charged with lying to a grand jury by testifying he did not know a former judge had been using drugs, and (2) another criminal defendant who was charged with selling drugs to the former judge in Alcocer's presence. (*Ibid.*) After speaking with independent counsel, Alcocer informed the trial court he wanted to waive his right to conflict-free representation. (*Id.* at p. 961.) Rather than inquiring whether Alcocer understood his right to conflict-free representation, the trial court granted the motion to recuse. (*Id.* at p. 955.) Alcocer sought writ relief, and the Court of Appeal granted the petition. (*Id.* at p. 955, 963.)

As the *Alcocer* court noted, "A right that is imposed, as compared to a right that is chosen, is an impoverished right. A right derives its significance and vitality from its being chosen." (206 Cal.App.3d at p. 957.) "Through waiving the right to conflict-free counsel, a defendant may reduce his [or her] chances for an acquittal. Such a choice, however, strengthens rather than weakens the right to counsel. Under our holding, a defendant is master of his [or her] own fate; it is he [or she], rather than the government, who decides who shall act as his [or her] counsel. A court abridges a defendant's right to counsel when it removes retained defense counsel in the face of a defendant's willingness to make an informed and intelligent waiver of his [or her] right to be represented by conflict-free counsel. [¶] California decisions 'limit *severely* the judge's discretion to intrude on defendant's choice of counsel in order to eliminate potential conflicts, ensure adequate representation, or serve judicial convenience.' (*Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 613, italics added.) We have stated that the right to assistance of counsel includes 'the right of an accused to be aided by [the] effective assistance of counsel of his [or her] own choosing at all critical stages of criminal proceedings.'

16

(*Boulas v. Superior Court* (1986) 188 Cal.App.3d 422, 431.) Our courts recognize that the right of a defendant 'to decide for himself [or herself] who best can conduct the case must be respected wherever feasible. [Fn. omitted.]' (*Maxwell, supra*, 30 Cal.3d at p. 615.)" (*Alcocer, supra,* 206 Cal.App.3d at p. 957.)

Under *Alcocer*, the trial court in this case was not required to force Ye or Xiao to speak with independent counsel. *Alcocer* held that "[a] waiver of the conflict may be properly taken where the court has 'assure[d] itself that (1) the defendant has discussed the potential drawbacks of joint representation with his [or her] attorney, *or if he* [*or she*] *wishes*, outside counsel, (2) that he [or she] has been made aware of the dangers and possible consequences of joint representation is his case, (3) that he [or she] knows of his [or her] right to conflict-free representation, and (4) that he [or she] voluntarily wishes to waive that right." (*Alcocer*, *supra*, 206 Cal.App.3d at p. 961, quoting *People v. Mroczko* (1983) 35 Cal.3d 86, 110, italics added.) *Alcocer* does not force a criminal defendant to meet with independent counsel but only that independent counsel be made available. (*Alcocer*, at p. 961.) Both Xiao and Ye acknowledge the trial court gave them the opportunity to speak with independent counsel.

The trial court was not required to compel Ye or Xiao to meet with independent counsel even after they knowingly and voluntarily rejected the option.

**E.**

***Ye and Xaio's Arguments Regarding the Validity of the Written Waivers***

Ye and Xiao argue their written waivers of conflict-free counsel, which they executed prior to trial, were invalid because the waivers were not translated into Mandarin. Even assuming the written waivers were ineffectual, the trial court's subsequent inquiry in open court ensured Ye and Xiao's waivers of the right to conflict-free counsel were knowing and voluntary.

17

## II

### *Xiao's Claim of Instructional Error*

Xiao argues the trial court erred in refusing to instruct the jury a mistake of law was a defense. We deem the argument to be forfeited.

To avoid forfeiture of her argument, Xiao had the burden to support her contentions with analysis and citation to evidence in the appellate record. (*People v. Hardy* (1992) 2 Cal.4th 86, 150; *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1159; *People v. Sangani* (1994) 22 Cal.App.4th 1120, 1135–1136.) However, Xiao's argument does not contain a single citation to the appellate record. "When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited." (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-407; see also *Bullock v. Philip Morris USA, Inc*. (2008) 159 Cal.App.4th 655, 678-679 [noting the appellate record must support a claim of instructional error].) The claim of instructional error is forfeited.

## III

### *Ye's Claim of Insufficiency of the Evidence for the Restitution Order*

Ye argues the evidence was insufficient as a matter of law to impose a restitution order to pay $8,746.95 to the utility company, SMUD. We may reverse a judgment when, "as a matter of law, the evidence was insufficient to support a conviction . . . ." (*People v. Eroshevich* (2014) 60 Cal.4th 583, 591.) Ye, however, does not provide any legal authority in support of his argument. Consequently, we deem the argument to be forfeited. (*People v. Hardy*, *supra*, 2 Cal.4th at p. 150; *In re S.C*., *supra*, 138 Cal.App.4th at pp. 406-407.)

DISPOSITION

The judgments are affirmed.

|                        |
|:----------------------:|
| /s/                    |
| HOCH, J.               |

We concur:

|            |
|:----------:|
| /s/        |
| BUTZ, Acting P. J. |

|            |
|:----------:|
| /s/        |
| MAURO, J.  |